(No. 78319.—)

MARILYN HAUDRICH, Ex'r and Sole Legatee of Donald Haudrich, Deceased, Appellee, v. HOW-MEDICA, INC., *et al.*, Appellants.

*Opinion filed January 18, 1996.—Rehearing denied April 1, 1996.*

526

HARRISON, J., took no part.
MILLER, J., concurring in part and dissenting in part.
HEIPLE, J., dissenting.

James V. O'Brien and Thomas L. Caradonna, of Lewis, Rice & Fingersh, L.C., of St. Louis, Missouri, for appellants.

Thomas Q. Keefe, Jr., P.C., and Harriet Homsher Hamilton, of Cook, Shevlin, Ysursa, Brauer & Bartholomew, Ltd., all of Belleville, for appellee.

Stephanie A. Scharf and Deirdre A. Fox, of Kirkland & Ellis, of Chicago, for *amici curiae* Health Industry Manufacturers Association, Abbott Laboratories, and Baxter International Inc.

Donnellda Rice, of Washington, D.C., for *amicus curiae* Health Industry Manufacturers Association.

Mark E. Barmak and Eric S. Palles, of Abbott Park, for *amicus curiae* Abbott Laboratories.

F. Samuel Eberts III, of Deerfield, for *amicus curiae* Baxter International Inc.

CHIEF JUSTICE BILANDIC delivered the opinion of the court:

The plaintiff, Donald Haudrich, brought this action for strict products liability in the circuit court of St. Clair County against defendant Howmedica, Inc., and for negligence against codefendant, Michael Lukens, a Howmedica sales representative. The plaintiff sought damages for injuries allegedly caused by a defective prosthetic device that had been surgically inserted into his knee. The plaintiff alleged that Howmedica designed, manufactured and sold the device that, at the time it left Howmedica's possession and control, was defective and unreasonably dangerous. He further alleged that Lukens negligently and carelessly sold the defective device and negligently and carelessly failed to warn of the device's defective and unreasonably dangerous condition. Following a bench trial, the trial court entered a judgment against the defendants and awarded the plaintiff damages of $1,686,988.70. The appellate court affirmed. (267 Ill. App. 3d 630.) We allowed the defendants' petition for leave to appeal. 145 Ill. 2d R. 315.[1]

The primary issue presented in this appeal is whether provisions of the United States Food, Drug, and

---

[1]The plaintiff died during the pendency of this appeal, and his wife, Marilyn, was substituted as the plaintiff in this action. For simplicity's sake, all references to "the plaintiff" herein should be understood to mean the decedent.

Cosmetic Act of 1938 (Act) (21 U.S.C. § 301 *et seq.* (1970)) preempt the plaintiff's State-law tort claims. Specifically, the defendants point to the Medical Device Amendments of 1976 (21 U.S.C. §§ 351 through 360 (1994)) as barring the plaintiff's claims. The appellate court rejected this contention, holding instead that the United States Congress did not intend to preempt common law tort actions by passing the Medical Device Amendments. The appellate court declined to address the plaintiff's argument that the defendants waived the issue of preemption by failing to raise it in the trial court.

The defendants also contend that the evidence was insufficient to prove that the plaintiff was injured by an unreasonably dangerous condition of the knee device, that the award of damages was excessive, and that the appellate court erred in finding that they waived the issue of whether Lukens' negligence had been sufficiently proved.

## FACTS

In 1983, the plaintiff sustained a work-related injury to his left knee and subsequently underwent a series of treatments to improve his condition. When these treatments failed, the plaintiff opted for a total knee replacement. The plaintiff's treating physician, Dr. William Simmons, selected the "PCA Total Knee System" manufactured by Howmedica. This device received pre-market approval by the Federal Food and Drug Administration in September 1988, three years after the plaintiff's surgery.

The surgery was performed in November 1985. The plaintiff was allowed to return to work one year later. Approximately $2^1/_2$ years after the surgery, the plaintiff complained to Dr. Simmons of "popping" inside his knee joint. In May 1988, the plaintiff began complaining of pain, swelling and instability in his knee. A few months

later, the plaintiff felt something snap inside the back of his knee, and shortly thereafter, the decision was made to replace the prosthetic knee device. At the time the initial surgery was performed, Dr. Simmons had informed the plaintiff that the knee prosthesis would last approximately 10 years, give or take two years, and that it would eventually need to be replaced. Charles Lawyer, Howmedica's director of quality assurance, testified that he was unable to say how long the knee device should last, since its longevity depended on numerous factors. The prosthetic device implanted in the plaintiff's knee failed in less than three years.

The PCA Total Knee System is comprised of three components. The component at issue is comprised in part of a piece of polyethylene plastic which rests inside a metal tray and is situated on top of the shin bone. While performing the "revision" surgery in January 1989, Dr. Simmons discovered that the polyethylene piece attached to the first knee implant had "almost completely worn away," and he found "multiple shavings of this particular plastic" behind the plaintiff's knee joint. Dr. Simmons determined that the plastic piece had slipped from its original position, which explained the plaintiff's statement that something in the knee had "popped." At a deposition, Dr. Simmons testified that when he implanted the first device, he did not expect the plastic failure to occur. He had used the device in the past and had been satisfied with its performance. Based on his findings during the second surgery, Dr. Simmons opined that the first knee prosthesis failed to perform as reasonably intended, based on a reasonable degree of medical and scientific certainty. He could not identify anything in his surgical technique or in the plaintiff's physical makeup that could explain the device's failure. Although the plaintiff had a deformity in his legs which caused bowleggedness, this condition

did not contribute to the premature wear of the polyethylene piece. Dr. Simmons found no evidence that the plaintiff had abused the prosthesis.

The second knee replacement differed from the first in that the thickness of the polyethylene piece was nine millimeters as opposed to seven. Bone cement was also used to hold the second device in place whereas a cementless process was used to secure the first one. Dr. Simmons explained that the nine-millimeter model was available at the time of the initial surgery, but he opted for the thinner model because it required less of the plaintiff's bone to be removed, and Howmedica representatives advised that the thinner model be used to preserve bone mass. At that time, Howmedica had not yet recommended that doctors discontinue using the seven-millimeter model. Sometime after the initial surgery, Howmedica began advising doctors to use the thicker model because the other model was "perhaps a little too thin." Dr. Simmons criticized the seven-millimeter polyethylene as being too thin.

After the second surgery, the plaintiff was unable to return to work, and it was not anticipated that he would ever be able to do so. According to Dr. Simmons, the plaintiff continued to complain of pain in his knee even after the second surgery. At the time of trial in July 1992, the plaintiff complained of pain, stiffness, swelling and some instability of the knee. Dr. Simmons stated, however, that the plaintiff was "much better off" having had the second surgery.

Dr. Simmons explained, however, that with every successive knee replacement, the knee becomes more and more unstable. He stated that after a certain number of revisions, it becomes necessary to insert a prosthesis which locks together. After a third or fourth revision, the insertion of that type of prosthesis may have become necessary for the plaintiff. However, it

would not have become necessary if the plaintiff had needed only two surgeries in his lifetime, as Dr. Simmons had contemplated, given the plaintiff's age and the anticipated lifespan of the device. Dr. Simmons also noted that subsequent revision surgeries increase the risk of infections, nerve damage, and vessel injury and make rehabilitation more difficult. He added that the expected life of a revision implant tends to decrease as the number of revisions increases. At the time of trial in 1992, the cost of a revision surgery, according to Dr. Simmons, was between $25,000 and $30,000.

The plaintiff's expert witness, Roy D. Bloebaum, Ph.D., testified as to his expertise in the analysis of prosthetic devices. In the course of his research, he investigated a problem with respect to the premature wear of polyethylene in various prosthetic devices and co-authored numerous articles on the subject. Dr. Bloebaum testified that the minimum life expectancy of the PCA Total Knee System was 10 to 12 years, with 18 to 20 years not being unreasonable. Dr. Bloebaum cited one study which reported that 65% of knee devices which predated the PCA device survived 17 years. Dr. Bloebaum agreed that the survivability of a device depended on many factors, including the manner of use and the patient's weight. He saw nothing in the plaintiff's physical makeup that would have adversely affected the lifespan of the knee device. He did not criticize Howmedica's use of the polyethylene material since that was all that was available at the time the device was manufactured, but he did criticize the fact that the polyethylene was processed using heat, which made it susceptible to certain defects like pitting, scratching and "delamination," whereby the polyethylene breaks apart in layers. The specific design errors he noted in addition to the heat processing were concentrated stresses on the femoral component of the device which

fits over the polyethylene and the use of a polyethylene plastic piece that had an inadequate thickness. According to Dr. Bloebaum, these design characteristics lead to premature wear and failure of the device. He opined to a reasonable degree of scientific certainty that these characteristics caused the product to be unreasonably dangerous and defective. He eliminated misalignment in the plaintiff's case as a cause of the device's failure.

Defendants' expert, Dr. John Lyons, a specialist in total joint reconstruction, testified that the prosthesis was implanted at an excessive angle, which was the cause of the premature wear of the polyethylene plastic. He based this opinion on a review of post-operative X rays and on an analysis of the knee device that was removed from the plaintiff's body. In Dr. Lyons' opinion, neither the thickness of the polyethylene insert nor the heat processing played any role in the failure of the plastic.

Stephen Hirsch, Howmedica's director of sales and formerly its director of marketing for reconstructive products, testified concerning a Howmedica publication entitled the "Polyethylene Awearness Series." The publication was undertaken because orthopedic surgeons were becoming "quite concerned" about premature wear of the polyethylene piece used in the knee device and about the increasing number of revision surgeries having to be performed. A Howmedica bulletin acknowledged that questions were being asked by orthopedic surgeons about implant design, insert thickness, contact stresses and material composition as they related to polyethylene wear. Through the "Awearness Series," Howmedica sought to determine if premature wear could result from a design which subjected the polyethylene plastic to contact stresses, from an insert that was too thin, or from the heat processing method Howmedica used. Hirsch concluded they were all factors but added

that there were other factors which could also explain the premature wear of the polyethylene piece. Howmedica ultimately determined, at some point after the plaintiff's first surgery, that a seven-millimeter plastic piece was too thin and eventually advised doctors to stop using it. Hirsch agreed that if premature failure resulted from contact stresses, the use of heat to process the piece, and inadequate polyethylene thickness, the product would be considered unsafe.

Howmedica's vice president of product development, Peter Van Syckle, testified for the defendants that the design of the PCA Total Knee System was not defective. He acknowledged that the particular device implanted in the plaintiff's knee could have been defective and agreed that the polyethylene plastic failed. However, he stated that other factors besides those claimed by the plaintiff could have caused the failure. Van Syckle defined a defective product as one that does not perform in a "reasonably anticipated way" and acknowledged the testimony of Dr. Simmons, as the user of the device, that the product did not perform as reasonably anticipated.

## ANALYSIS

### A. Preemption

The defendants contend that section 360k of the Medical Device Amendments to the Act (21 U.S.C. § 360k (1994)) expressly preempts the plaintiff's State-law tort claims. As previously stated, the appellate court rejected this contention, concluding instead that Congress did not intend to preempt common law tort actions by enacting the Medical Device Amendments. The appellate court declined to address the plaintiff's claim that the defendants waived the issue of preemption by failing to raise it in the trial court. We, however, have decided to address the issue. For the reasons which fol-

low, we hold that the waiver doctrine should apply to the situation presented here.

It is well settled that issues not raised in the trial court are deemed waived and may not be raised for the first time on appeal. (See *Daniels v. Anderson* (1994), 162 Ill. 2d 47, 58-59; *Geise v. Phoenix Co. of Chicago, Inc.* (1994), 159 Ill. 2d 507, 514-15; *Lannom v. Kosco* (1994), 158 Ill. 2d 535, 539-40; *Mittelman v. Witous* (1989), 135 Ill. 2d 220, 230.) In *Daniels*, this court reiterated that " 'the theory upon which a case is tried in the lower court cannot be changed on review, and *** an issue not presented to or considered by the trial court cannot be raised for the first time on review.' " (*Daniels*, 162 Ill. 2d at 58, quoting *Kravis v. Smith Marine, Inc.* (1975), 60 Ill. 2d 141, 147.) We concluded that allowing the defendant to change his theory of defense on appeal would "not only weaken the adversarial process and our system of appellate jurisdiction" (*Daniels*, 162 Ill. 2d at 59), but would likely prejudice the plaintiff, since he may have been able to present evidence to discredit the theory had it been raised in the evidence presentation stage, that is to say, in the trial court. *Daniels*, 162 Ill. 2d at 59.

Similarly, in *Geise*, this court concluded that the theory the defendant attempted to raise for the first time on appeal, which was based on a State statutory provision, was in the nature of an affirmative defense and, as such, was waived by not being presented initially in the trial court. (*Geise*, 159 Ill. 2d at 514.) In finding waiver, the court in *Geise* determined that the situation presented was not one in which "some basic legal impediment exist[ed] to a claim or defense on which the judgment [was] based," nor was it "a situation where a party need[ed] to be rescued from some inadvertent blunder it or its attorney made at trial." (*Geise*, 159 Ill. 2d at 514.) This court determined, rather, that the de-

fendant had made a purely strategic decision not to raise the statute-based theory at trial in the hope that the plaintiff's common law negligence claim would fail and it would escape liability entirely. The court emphasized that "our responsibilities as a court of review do not extend to protecting a party from its own failed trial strategy." *Geise*, 159 Ill. 2d at 514-15.

The defendants in this case argue, however, that the claim of preemption is not in the nature of an affirmative defense but is a jurisdictional matter which cannot be waived and which may be raised at any time. Specifically, they argue that section 360k of the Medical Device Amendments deprives State courts of jurisdiction to render judgments for damages based on State tort law for defective or unreasonably dangerous medical devices which have received premarket approval by the Food and Drug Administration. We reject this argument. Initially, we note that on at least one occasion, this court has recognized that a party's failure to invoke the Federal preemption doctrine in the trial court may preclude him from raising it on appeal. (See *Beckman v. Freeman United Coal Mining Co.* (1988), 123 Ill. 2d 281, 286.) Moreover, we find the Supreme Court's decision in *International Longshoremen's Association v. Davis* (1986), 476 U.S. 380, 90 L. Ed. 2d 389, 106 S. Ct. 1904, upon which the defendants primarily rely in support of their claim that the issue of Federal preemption is jurisdictional, to be inapposite to the case at bar.

*Davis* involved the application of the National Labor Relations Act (NLRA). There, the Supreme Court held that the appellant's preemption claim was not a waivable affirmative defense because the claim went to the trial court's power to adjudicate the case. In so ruling, the Court found that Congress had deprived courts of jurisdiction to decide cases involving conduct that is or may likely be protected by the NLRA, and it did so by

"vesting exclusive jurisdiction over [the] controversy in another body," namely, the National Labor Relations Board. (*Davis*, 476 U.S. at 388, 90 L. Ed. 2d at 398, 106 S. Ct. at 1910.) The Court noted:

> " 'Congress did not merely lay down a substantive rule of law to be enforced by any tribunal competent to apply law generally to the parties. It went on to confide primary interpretation and application of its rules to *a specific and specially constituted tribunal* and prescribed a particular procedure for investigation, complaint and notice, and hearing and decision, including judicial relief pending a final administrative order.' " (Emphasis added.) (*Davis*, 476 U.S. at 389, 90 L. Ed. 2d at 399, 106 S. Ct. at 1911, quoting *Garner v. Teamsters, Chauffeurs & Helpers Local Union No. 776* (1953), 346 U.S. 485, 490, 98 L. Ed. 228, 239, 74 S. Ct. 161, 165-66.)

The Court emphasized that it was "essential" to the administration of the NLRA that determinations with respect to activities within the purview of that statute " 'be left in the first instance to the National Labor Relations Board.' " *Davis*, 476 U.S. at 390, 90 L. Ed. 2d at 400, 106 S. Ct. at 1911, quoting *San Diego Building Trades Council v. Garmon* (1959), 359 U.S. 236, 244-45, 3 L. Ed. 2d 775, 783, 79 S. Ct. 773, 779.

In short, the *Davis* Court determined that the issue on review was not whether the State court erroneously decided a matter of Federal law in a case within its jurisdiction or whether Federal or State law governed a case properly before the State's courts. Rather, the situation involved a State court " 'finally and erroneously asserting its jurisdiction to deal with a controversy which [was] beyond its power and instead [was] within the exclusive domain of the National Labor Relations Board.' " (*Davis*, 476 U.S. at 390-91, 90 L. Ed. 2d at 400, 106 S. Ct. at 1912, quoting *Local No. 438 v. Curry* (1963), 371 U.S. 542, 548, 9 L. Ed. 2d 514, 519, 83 S. Ct. 531, 536.) In other words, the Court noted, the issue was a choice-of-forum rather than a choice-of-law question.

*Davis*, 476 U.S. at 391, 90 L. Ed. 2d at 401, 106 S. Ct. at 1912.

In the present case, however, unlike in *Davis*, Congress has not designated another forum for the resolution of disputes concerning medical devices. Although Congress has enacted a body of substantive law dealing with such devices, it has not " 'confide[d] primary interpretation and application of its rules to a specific and specially constituted tribunal.' " (*Davis*, 476 U.S. at 389, 90 L. Ed. 2d at 399, 106 S. Ct. at 1911, quoting *Garner v. Teamsters* (1953), 346 U.S. 485, 490, 98 L. Ed. 228, 239, 74 S. Ct. 161, 165-66.) Thus, the issue here does not involve a choice of forum but instead concerns whether State tort or Federal statutory law controls. Under these circumstances, the issue of preemption is not jurisdictional but is in the nature of an affirmative defense, subject to the traditional rules of appellate adjudication, including timely presentment of issues and waiver.

Under circumstances virtually identical to those presented here, the First Circuit Court of Appeals, in *Violette v. Smith & Nephew Dyonics, Inc.* (1st Cir. 1995), 62 F.3d 8, applied the waiver rule where the defendant failed to argue at trial the issue of preemption over State products liability claims pursuant to the Medical Device Amendments. The court held that the defendant would not be permitted to " 'evade the scrutiny of the [trial] court *** on appeal with a new claim in order to create essentially a new trial.' " (*Violette*, 62 F.3d at 11, quoting *G.D. v. Westmoreland School District* (1st Cir. 1991), 930 F.2d 942, 950.) We concur in this view. Moreover, we have found several appellate court decisions of this State and numerous Federal court decisions to be in accord with this approach as well. (See, *e.g.*, *Zook v. Norfolk & Western Ry. Co.* (1994), 268 Ill. App. 3d 157, 164; *Yates v. Doctor's Associates, Inc.* (1990), 193 Ill. App. 3d 431, 438. See also *Piekarski v. Home Owners*

*Savings, F.S.B.* (8th Cir. 1992), 956 F.2d 1484, 1489; *Sweeney v. Westvaco Co.* (1st Cir. 1991), 926 F.2d 29, 36-41; *Dueringer v. General American Life Insurance Co.* (5th Cir. 1988), 842 F.2d 127, 130; *Johnson v. Armored Transport of California, Inc.* (9th Cir. 1987), 813 F.2d 1041, 1043-44; *Gilchrist v. Jim Slemons Imports, Inc.* (9th Cir. 1986), 803 F.2d 1488, 1496-97.) Neither the plaintiff nor the trial judge in this case had his "rightful opportunity to address the question in the first instance" (*Violette,* 62 F.3d at 11), and for this reason we hold that the issue of preemption is waived. We thus save for another day the question of whether the Medical Device Amendments to the Act, and specifically section 360k, preempt the sort of State-law tort claims raised by the plaintiff here.

We turn now to the remaining issues the defendants raise on appeal.

### B. Sufficiency of the Evidence

The defendants first contend that there was insufficient evidence to support a finding that the plaintiff was injured by an unreasonably dangerous condition of the knee device.

It is axiomatic that a manufacturer has a duty to use reasonable care in the design and manufacture of its product, bearing in mind the intended and actual uses of the product. (*Buehler v. Whalen* (1977), 70 Ill. 2d 51, 60-61.) In order for a plaintiff to recover in strict liability, his injury must be shown to result from a condition of the product, the condition must be unreasonably dangerous, and the condition must have existed at the time the product left the manufacturer's control. (*Hunt v. Blasius* (1978), 74 Ill. 2d 203, 210.) In an attempt to once again define the term "unreasonably dangerous condition," the court in *Hunt* agreed that " 'those products are defective which are dangerous because they fail to perform in the manner reasonably to be expected

in light of their nature and intended function.' " (*Hunt*, 74 Ill. 2d at 211, quoting *Dunham v. Vaughan & Bushnell Manufacturing Co.* (1969), 42 Ill. 2d 339, 342.) The court went on to find that a condition or defect in a product is unreasonably dangerous if it subjects those exposed to the product to an unreasonable risk of harm beyond that which would be contemplated by the ordinary person with ordinary knowledge common to the community as to the product's characteristics. *Hunt*, 74 Ill. 2d at 211-12, citing Restatement (Second) of Torts § 402A, Comment *i* (1965). See also *West v. Deere & Co.* (1991), 145 Ill. 2d 177, 180.

Applying the foregoing principles to the present case, we hold that sufficient evidence was presented at trial to find Howmedica strictly liable for the plaintiff's injuries.

Dr. Simmons testified that, based on information he received from Howmedica representatives at seminars and based on his background and experience, he believed the plaintiff's knee replacement would last 10 years, give or take two years. The plaintiff's expert witness, Dr. Bloebaum, testified at trial that the minimum life expectancy of the Howmedica device was 10 to 12 years, and that it was not unreasonable to expect it to last 18 to 20 years. Although both doctors agreed that numerous factors dictated the survivability of the device, neither found that the plaintiff's physical makeup, his physical activities or the placement of the device in the plaintiff's body was a factor leading to the premature failure of the polyethylene insert after less than three years. Both doctors opined that the device failed to live up to its intended function, based on a reasonable degree of medical and scientific certainty, primarily because of the inadequate thickness of the polyethylene insert, which Howmedica itself later recognized.

Dr. Bloebaum's examination of the device at issue

revealed delamination, or separation of the polyethylene, as well as pitting and scratching, which he testified were consistent with a design that uses a heat-pressing technique. While he had no quarrel with Howmedica's use of the polyethylene material, he testified that the defects apparent in the device were magnified by the combination of heat pressing, the inadequacy of the plastic's thickness, and contact stresses. Dr. Bloebaum opined that the device was defective and unreasonably dangerous on these bases.

Although Howmedica's vice president of product development, Van Syckle, testified that the design of the knee device was not defective, he acknowledged that the polyethylene insert failed and agreed that the device implanted in the plaintiff's knee could have been defective. He also agreed that the company's manufacturing technique using heat may have contributed to accelerated wear of the polyethylene but disagreed that the thickness of the plastic was a factor. Howmedica's expert, Dr. Lyons, opined that Dr. Simmons' misalignment of the device in the plaintiff's body and the plaintiff's activities after surgery were the causes of the device's failure. Dr. Lyons agreed that all of the radiologist's reports indicated that the device was in excellent alignment, but he nevertheless concluded that Dr. Simmons' failure to comply with appropriate medical standards led to its premature failure.

Despite the testimony of Howmedica's experts to the contrary, sufficient evidence was presented to support a finding that the device failed to perform in a manner reasonably expected in light of its nature and intended function and subjected the plaintiff to an unreasonable risk of harm beyond that contemplated by an ordinary person. We conclude that the plaintiff met his burden of proving that his injuries resulted from an unreasonably dangerous condition of the Howmedica knee device.

## C. Damages

The defendants also contend that the damages award totaling $1,686,988.70 was excessive.

The rule that findings of a trial court sitting without a jury will not be disturbed unless manifestly erroneous is equally applicable to an assessment of damages. (*Lynch v. Precision Machine Shop, Ltd.* (1982), 93 Ill. 2d 266, 278.) The general rule of damages in a tort action is that "the wrongdoer is liable for all injuries resulting directly from the wrongful acts ***, provided the particular damages are the legal and natural consequences of the wrongful act imputed to the defendant, and are such as might reasonably have been anticipated. Remote, contingent, or speculative damages do not fall within this general rule." *Siemieniec v. Lutheran General Hospital* (1987), 117 Ill. 2d 230, 259.

Regarding medical expenses, Howmedica argues that the $21,000 attributable to the revision surgery was nonrecoverable because the evidence undisputedly reveals that the plaintiff would have had to undergo another revision surgery at some point. Dr. Simmons testified, however, that, had the initial knee device lasted as long as anticipated—approximately 10 years according to Simmons and as long as 18 years according to Dr. Bloebaum—only one revision surgery would have been necessary in the plaintiff's lifetime. Because the first device failed in less than three years, the evidence reveals that multiple revision surgeries might have been necessary. The trial court was well within its discretion to compensate the plaintiff for the expense of an additional revision he would not otherwise have had to face had the initial device not failed.

We likewise conclude that it was within the trial court's discretion to award the plaintiff lost wages of approximately $400,000. The evidence indicates that, at the time of the initial surgery, the plaintiff was 46 years old and had been consistently employed in the same job

for nearly 20 years prior to that. There was no evidence presented that the plaintiff would not have worked to retirement age had he been able to do so. At the time of the surgery, the plaintiff was earning $25,000 per year. As previously stated, the plaintiff presented evidence demonstrating that a nondefective knee device could last as long as 18 years. In light of this evidence, the trial court could well have concluded that the plaintiff lost 16 years of income by having to undergo revision surgery several years sooner than anticipated. We do not believe an award of $400,000 for lost wages was manifestly erroneous.

The remainder of the damages award was for the plaintiff's pain and suffering, disability and disfigurement, and future medical expenses. The dissent contends that the amounts awarded for pain and suffering and for disability and disfigurement are "grossly excessive" and should be reduced. While it is unclear from the record precisely how much of the $1.69 million award the trial court allocated to these two categories of damages, the dissent estimates that it was between $1 million and $1.2 million. Even if that is the case, we do not agree that such an award is "grossly excessive." To the contrary, we believe the damages awarded are amply supported by the evidence.

While we are cognizant of the fact that the failed device did not *cause* the plaintiff's original knee injury, we nevertheless find that it was responsible for a substantial portion of the pain, suffering, disability and disfigurement the plaintiff experienced from the spring of 1988, when the device failed, onward. As the evidence reveals, both the plaintiff and his doctor fully anticipated that the plaintiff would be able to return to work following the initial knee surgery. He, in fact, did so one year later. After the device failed, however, the plaintiff was unable ever to return to the job he had performed for

nearly 20 years or to any other job, and his activity level outside of work was also severely curtailed. Had the device functioned as intended, the plaintiff could have lived at least five and as many as 15 or 16 years longer, according to Dr. Simmons, without the disability and disfigurement which flowed from the device's failure. We hold that the trial court did not manifestly err in awarding the damages it did for the plaintiff's disability and disfigurement.

Moreover, ample evidence was presented at trial showing that the plaintiff endured a significant degree of physical and mental suffering beginning as early as $2^{1}/_{2}$ years after the initial surgery, when his knee began to pop and swell and become unstable. To alleviate these symptoms, the premature revision surgery had to be performed. However, that surgery was unsuccessful in eliminating the physical problems which occurred when the first device failed. In fact, at the time of trial, which followed four years after the second surgery, the plaintiff still complained of pain, stiffness, swelling and instability in his knee. While we agree with defendants that pain, swelling and other physical signs leading to the necessity for revision knee surgery occur regardless of *when* a device wears out, the fact is that the revision surgery in this case was forced to occur several years earlier than it should have been, causing the plaintiff to experience unanticipated suffering during a time in which the initial knee device should have improved his condition. Moreover, while we acknowledge Dr. Simmons' testimony that the plaintiff was better off having had the second surgery, it is difficult to imagine how he would not have been, given that the failure of the first device led to popping and snapping inside his knee joint and caused a significant amount of pain, swelling, and instability in his knee.

Moreover, the evidence shows that, because of the

premature failure of the knee device, the plaintiff in all likelihood would have had to undergo an additional surgery in his lifetime that would have been avoided had the initial knee device functioned for as long as expected. Apart from the physical pain another surgery would bring, Dr. Simmons testified, a third surgery would have caused the plaintiff's knee to become even more unstable and would have exposed the plaintiff to further risks of infections, nerve damage, and vessel injury.

This court has held in the past that a damages award for pain and suffering is proper where there is evidence of a physical injury. (See *Ballweg v. City of Springfield* (1986), 114 Ill. 2d 107, 116.) In light of the consequences flowing from the premature failure of the Howmedica knee device, as discussed above, we uphold the award of damages for the plaintiff's pain and suffering.

### D. Lukens' Liability

Finally, the defendants contend that the appellate court erred in finding that they waived their argument that the trial court's judgment against Lukens should be reversed based on insufficient evidence. The appellate court applied the waiver rule after determining that the defendants failed to raise the issue regarding Lukens' liability in its initial brief. The defendants maintain that the issue was sufficiently raised in their brief. We are unable to determine the propriety of the appellate court's ruling on this issue, however, because the defendants have failed to support their argument with adequate proof. Specifically, the record before us does not contain the defendants' initial brief filed in the appellate court. On review, the appellant has the burden of presenting the court with an adequate record regarding the claimed error (*Holston v. Sisters of the Third Order of St. Francis* (1995), 165 Ill. 2d 150, 163), and any doubts which may arise from the incompleteness of the

record will be resolved against the appellant (*Foutch v. O'Bryant* (1984), 99 Ill. 2d 389, 391-92). In the absence of the proof necessary to resolve the issue, we must presume that the appellate court's determination was proper.

## CONCLUSION

For the foregoing reasons, the judgment of the appellate court is affirmed.

*Affirmed.*

JUSTICE HARRISON took no part in the consideration or decision of this case.

JUSTICE MILLER, concurring in part and dissenting in part:

I agree with the majority's holdings that defendant Howmedica, Inc., waived its preemption defense and, further, that there was sufficient evidence to find Howmedica strictly liable for the plaintiff's injuries. I do not agree, however, with the majority's conclusion that the amount of damages awarded in this case is supported by the record.

In closing argument, plaintiff's counsel requested a damage award ranging between $1.6 million and $1.8 million, divided among the following: $200,000 for past and future medical expenses, $400,000 for past and future lost wages, $500,000 to $600,000 for pain and suffering, and $500,000 to $600,000 for disability and disfigurement. The trial judge apparently agreed with counsel's itemization, for, in a bench proceeding without a jury, the judge awarded nearly $1,690,000 in damages, a sum that approximates plaintiff's request.

I believe that the amount of damages awarded by the trial judge is against the manifest weight of the evidence. In upholding the present award, the appellate court concluded, from the testimony of the plaintiff's

own doctor, that the plaintiff might have lost seven years of employment as a consequence of the premature failure of the prosthesis at issue here. The plaintiff earned approximately $25,000 a year from his employment as a truck driver and laborer, so the amount of lost income according to his best estimate, even without discounting it to present value, would have been about $175,000, far less than the $400,000 urged by counsel.

An award of $200,000 for past and future medical expenses similarly lacks support in the record. The estimated expenses of a revision surgery are about $30,000. Although the premature failure of the plaintiff's prosthesis could necessitate earlier replacements in future years, a sum as large as $200,000 for medical expenses is at best speculative under the facts in this case.

Finally, one must question an award totaling more than $1 million for pain and suffering and disability and disfigurement. Plaintiff is entitled to be compensated only for the injuries attributable to the premature failure of the prosthesis involved here. Even if one allows that the failure of the device would accelerate the normal replacement schedule, I fail to see how the pain and discomfort, or disability and disfigurement, from the added procedures caused by that can justify an award of more than $1 million, the amount apparently determined here. For these reasons, I believe that the award of damages in this case is not supported by the record, and I would remand the action to the circuit court for further proceedings on this issue.

JUSTICE HEIPLE, dissenting:

"Little Jack Horner
Sat in the corner,
Eating a Christmas pie;
He put in his thumb,

And he took out a plum,
And said, 'What a good boy am I!' "

Plaintiff sought damages against defendants, How-medica and its sales representative, for injuries caused by the premature failure of the artificial knee manufactured by Howmedica. Defendants argued that provisions of the United States Food, Drug, and Cosmetic Act of 1938 (21 U.S.C. § 301 *et seq.* (1970)) preempted plaintiff's State-law tort claim. The majority determined, and I concur, that defendants waived their preemption argument by failing to raise it in the trial court.

I disagree, however, with the court's affirmance of the damage award. In truth, the damages awarded to plaintiff by the trial court are grossly excessive and should be reduced.

Plaintiff, then age 45, injured his knee at work in 1983. After other treatment options failed, plaintiff decided to undergo total knee replacement. In 1985, Howmedica's artificial knee was implanted and plaintiff's doctor related his hope that it would last 8 to 12 years. About three years later, however, plaintiff's Howmedica knee failed and it was successfully replaced with another Howmedica artificial knee. Plaintiff then brought a products liability suit against Howmedica and a negligence suit against Howmedica's sales representative. After a bench trial, plaintiff was awarded damages of $1,686,988.70.

To award such an excessive sum, the trial court either forgot or did not care that plaintiff's knee was not injured by defendants' device, but had been damaged years earlier in a work-related injury. The only valid complaint against defendants is that the artificial knee wore out sooner than the parties had hoped.

In closing argument, plaintiff argued that a proper damage award was $1.6 to 1.8 million, apportioned as: $200,000 for past and future medical expenses; $400,000 for past and future lost wages; $500,000 to $600,000 for

pain and suffering; and $500,000 to $600,000 for disability and disfigurement. Since the trial court awarded almost $1.69 million, an amount in the range suggested by plaintiff, it may be assumed that the individual awards were broken down as plaintiff suggested.

## PAIN AND SUFFERING

The trial court awarded plaintiff over $500,000 for pain and suffering. Since defendant's device did not cause plaintiff's original knee injury, plaintiff is entitled to pain and suffering damages only for affliction caused by the premature failure of defendant's device. At the time of trial, plaintiff's knee revision was doing fine and he was on no prescription pain medication. In addition, he had not seen the doctor in the 18 months prior to trial, other than during a routine yearly check-up. Such evidence does not support a damage award in excess of half a million dollars for pain and suffering.

## DISABILITY AND DISFIGUREMENT

Plaintiff received more than $500,000 for disability and disfigurement. As stated above, plaintiff is entitled to damages only for the disability and disfigurement that resulted from the premature failure of defendant's device.

After plaintiff's initial knee injury at work, he was disabled from many activities. Once his knee was replaced by the Howmedica knee, plaintiff was able to be more active, but was still restricted from heavy lifting. At that time, plaintiff's doctor rated him as having a 50% disability for purposes of worker's compensation.

Following failure of the Howmedica knee and the necessary revision surgery, plaintiff suffered from various disabilities, including limitations on boating, golf, and gardening. However, plaintiff is not entitled to damages for these restrictions because they existed prior to the implantation of the Howmedica knee and were not

caused by its premature failure. Indeed, plaintiff's doctor testified that plaintiff was better off after surgery than if he had never had knee replacement surgery.

Once again, this court refuses to rein in the riverboat gambling atmosphere that characterizes the Illinois tort system. See *Lee v. Chicago Transit Authority* (1992), 152 Ill. 2d 432, 480 (Heiple, J., dissenting) ("While the courts could order remittitur in an appropriate case such as [this], they have shown no willingness to do so").

Justice demands that plaintiff's damages should be subject to a substantial remittitur. Accordingly, I respectfully dissent.