ROBERT RHEINHEIMER, Plaintiff-Appellee, v. THE VILLAGE OF CRESTWOOD *et al.*, Defendants-Appellants.

First District (1st Division)   Nos. 1—95—3965, 1—96—0078 cons.

Opinion filed May 27, 1997.—Rehearing denied September 17, 1997.

Ancel, Glink, Diamond, Cope & Bush, P.C., of Chicago (Michael W. Tootooian, of counsel), for appellants.

Stagno & Raymond, of Schaumburg (Clark M. Raymond, of counsel), and David A. Novoselsky & Associates, of Chicago (David A. Novoselsky and Margarita T. Kulys, of counsel), for appellee.

PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

This appeal arises out of a jury verdict and judgment entered against defendants, Village of Crestwood police officers Charles Greinke and Christopher DiVirgilio, f/k/a Christopher Rodriguez, and in favor of the plaintiff, Robert Rheinheimer, in connection with plaintiff's action against defendants for the use of excessive force in

violation of his civil rights pursuant to 42 U.S.C. section 1983 (1994). On appeal, defendants contend that: (1) the jury verdict was contrary to the manifest weight of the evidence and the trial court erred in failing to enter judgment notwithstanding the verdict; (2) they were denied a fair trial by cumulative trial errors; (3) the jury received improper instructions; and (4) the award was excessive. For the following reasons, we affirm the judgment of the trial court.

The record reveals the following relevant facts. On August 12, 1990, defendants Greinke and DiVirgilio, and a third codefendant, Bryan Ott (Ott), arrested plaintiff after they stopped his vehicle on Cicero Avenue near Route 83 or "Cal-Sag." Subsequently, plaintiff filed an action against defendants, Ott, and the Village of Crestwood, claiming that defendants used excessive force during his arrest in violation of his constitutional rights and 42 U.S.C. section 1983.

At trial, plaintiff testified that on August 11, 1990, at 10 p.m., he went to a nightclub called Cocomos, located at Route 83 and 127th Street in Crestwood. Plaintiff had a beer, followed by a mixed drink, and a shot of straight alcohol. Plaintiff danced with a girl, then had another beer and left Cocomos at approximately 2:30 to 3 a.m. on August 12. Plaintiff stated that, altogether, he consumed four or five drinks over a four- or five-hour period and that he did not feel intoxicated.

As he drove away from Cocomos on Cal-Sag, he noticed some police mars lights in his rearview mirror. Plaintiff did not pull over immediately because the highway was one-lane wide, and there was a ditch in the gravel shoulder of the highway. Plaintiff waited to stop his car until the road divided into two lanes near Cicero, exited his car, and walked back toward the police vehicle, which had stopped behind him.

At that point, defendant DiVirgilio exited his police vehicle, walked toward plaintiff and said, "[W]hat the hell do you think you're doing[?]" Plaintiff responded that he was trying to get home to his girl friend. DiVirgilio then grabbed plaintiff's left arm, spun him around, and threw him against the back of his car, causing plaintiff to hit his chin on his car. Plaintiff stood up and pushed himself off the car, at which point DiVirgilio pushed him from the back again, slamming plaintiff's head against the back windshield of plaintiff's car. Plaintiff stated that he was so scared that he urinated in his pants and that DiVirgilio laughed at him. Plaintiff then put his arm over DiVirgilio's head and brought him into a headlock. Plaintiff did not remember anything that happened after that.

Plaintiff stated that the next thing he remembered is waking up in a jail cell in the Crestwood police department handcuffed to a

bench and bleeding from his chin. Plaintiff looked out of a small window in his jail cell and asked, "[W]hy did they do this to me[?]" At around 7 or 8 a.m., DiVirgilio questioned plaintiff about his drinking the night before. Plaintiff was then allowed to make one telephone call for bail.

Plaintiff called his girl friend and told her that he was in jail, that he had been beaten up, and that he needed $100 for bail. Plaintiff was released from custody between 8 a.m. and 9 a.m. Plaintiff was treated at Christ Hospital in Oak Lawn, where he received five stitches on his chin.

Plaintiff stated that the police brought three battery charges against him for resisting arrest and additional charges for driving under the influence, crossing the shoulder, and failure to yield to an emergency vehicle.

Plaintiff further stated that while he was in the jail cell handcuffed to the bench, he overheard a male voice outside the door say "that's what's going to happen to you when you mess with a six-degree black belt."

On cross-examination, plaintiff admitted that, prior to his vehicle stop, he was exceeding the speed limit and that he thought the police vehicle was following him for speeding. Plaintiff stated that it was possible that he left his driving lane and hit some gravel in the shoulder area while he was driving, but he did not recall crossing the center line. Plaintiff had no recollection of turning onto Cicero. After he was released from jail, plaintiff observed some blood on both the rear windshield and the trunk of his car, covering about a third of each area.

Plaintiff did not recall either refusing medical treatment or being uncooperative with emergency medical technicians at the police station. As a result of this incident, plaintiff's driver's license was suspended for six months.

When plaintiff testified as an adverse witness in the defendants' case, he admitted that, during a prior deposition, he testified that he did not recall urinating in his pants and stated that no one brought it to his attention at the scene. Plaintiff explained the contradiction with his trial testimony by stating that, at the deposition, he was embarrassed to admit that he had urinated in his pants.

Pam Barre testified on plaintiff's behalf that, on August 11, 1990, she lived in Crestwood and was married to Leonard Barre.[1] At around midnight, Pam and a girl friend went to Cocomos for two to four

---

[1]At the time of trial, Pam and Leonard were divorced. The record shows that neither Pam nor Leonard testified at plaintiff's criminal trial.

hours. Leonard arrived at Cocomos, Pam and Leonard got into a fight, Pam left Cocomos and began to walk home on Cal-Sag. Leonard followed Pam, and they started to push each other. Shortly thereafter, two police squad cars arrived.

Pam identified defendant Greinke as one of the officers who arrived on the scene. The officers questioned Pam and Leonard for about 15 to 20 minutes, and each of them got into a separate police car. Pam never saw a car speed past her while she was standing out on Cal-Sag.

Once in the police car, the officers got a radio call and proceeded on Route 83 towards Cicero Avenue. At Cicero, the officers pulled up behind another squad car, got out, and three officers tried to hold down a guy whose hands and legs were "flying all over." The guy was sitting in his car with his legs hanging out of the car. Pam crawled over the front seat of the squad car and asked the officers if they needed assistance. It did not appear to Pam that the individual was attacking the officers, but just that he was resisting arrest. Pam could not identify plaintiff in court from that incident because she never saw his face at the scene. Later, Officer Greinke returned to the police car and said that the officers were fine and that the guy was "whacked out." The officers drove Pam to her home. After that evening, Greinke returned to Pam's house in uniform.

Leonard Barre then testified that, in the early morning hours of August 12, 1990, he met Pam at Cocomos. A few weeks later, Greinke came to the Barre home dressed in his police uniform. Pam was present at the time. Greinke asked Leonard about the night of August 11, 1990, stated that there was going to be a trial regarding the incident, and wanted to know whether either Leonard or Pam could remember anything that would be helpful to him. Leonard stated that he did not remember anything pertinent. Pam stated that she did not remember much either.

About a month later, Greinke returned to the Barre home in civilian clothes and again asked Leonard if he could remember anything helpful in order to testify. Pam was not present at that time. Greinke stated that if Leonard could not "remember you know, stuff, he [Greinke] may be able to help," refresh Leonard's recollection of "what went on that night." Leonard told Greinke outright that he did not want to testify because he did not want to miss work and did not know anything important. Greinke stated that he would be sure that Pam had a ride to court and back and that Leonard would be "taken care of" for his time if he could remember anything, but he did not mention anything in particular. Leonard told Greinke that he was not interested and felt uncomfortable, but that if he

remembered anything important he would come forward. Leonard saw Greinke once more after that, right before trial, and gave Greinke Pam's address and telephone number.

Leonard then testified as a defense witness, pursuant to subpoena. Leonard testified to the same essential facts as Pam, explaining how they came to be standing out on Cal-Sag in the early morning hours of August 12, 1990.

Leonard stated that he saw no vehicles proceeding southeast on Cal-Sag toward them. However, before Leonard left the scene, he heard a noise and saw dust flying up, and a vehicle approached from the southeast, driving off the road and into the gravel shoulder of the road. Leonard observed the vehicle regain its position on the road and proceed in a southeast direction. One of the officers on the scene stated that he was going to check out the vehicle. Another squad car arrived and transported Leonard back to his car, which was parked at Cocomos. Leonard headed toward home driving down Cal-Sag toward Cicero.

When Leonard reached the intersection of Cal-Sag and Cicero, he saw a car pulled over and two squad cars behind it. Leonard saw Pam get out of one squad car and stand by the side of the vehicle. Leonard stopped to investigate the situation, turning right, heading south on Cicero, and parking about a quarter of a block from the intersection.

Leonard observed three officers outside their vehicles. The officers were talking to a man outside the back of his vehicle, and Leonard observed the man struggling with Officer Ott, while Ott tried to get the man out of his vehicle. Leonard saw the man take a swing at Officer Ott, Ott and then the man went down, then the other two officers grabbed the man, tried to subdue him, and put him in the back of a squad car. Leonard did not see any of the officers use any nightsticks on the man or punch or kick him. The officers were trying to keep the man from swinging his arms and legs.

On cross-examination, Leonard stated that when he first arrived at the scene of the altercation, the man was still seated in his car, that Ott approached the man's car, and that, eventually, the man got out of his car. At trial, Leonard could not positively identify plaintiff as the man involved in the altercation. Leonard saw the man walk away from Ott, heading toward the back of his car, toward where two other officers were standing. Then the man abruptly turned around and walked back toward the front of his car as the officers began to approach him. As Ott started to grab the man, the man took a swing at Ott and hit Ott in the face, knocking Ott to the ground. The man fell to the ground also and, at that point, the other two officers

grabbed the man by his arms and legs and held him down. The officers then put the man into a squad car.

Next, Bryan Ott testified that he was last employed as a police officer in Crestwood in 1991. On August 12, 1990, in the early morning hours, Ott and Greinke received a radio call for assistance from DiVirgilio and met DiVirgilio in his squad car on Cal-Sag. At the time, Pam Barre was seated in the back of the squad car. Ott and Greinke approached DiVirgilio and pulled plaintiff off of him, at which point all three men fell onto the back of plaintiff's car. The officers then picked up plaintiff and put him against the back of his car. Then the whole group of men fell to the ground again.

Counsel indicated contradictions between Ott's trial testimony and his previous testimony at plaintiff's criminal trial and at a deposition. For example, Ott stated that he did not recall being punched in the jaw during the altercation and did not notice that plaintiff had a head injury until they arrived at the police station. Ott admitted that he testified in plaintiff's criminal trial that plaintiff never struck him in the face and that he was not injured at all during the altercation. Ott stated that, in his opinion, plaintiff was under the influence of alcohol on the evening of the incident but agreed that, at plaintiff's criminal trial, he testified that he had no opinion as to whether plaintiff was under the influence of alcohol. Ott denied seeing any blood by plaintiff's car at the scene but admitted that, in a prior deposition, he testified that he did, in fact, see blood by plaintiff's car.

Ott concluded that he never saw either Greinke or DiVirgilio receive any medical attention after the incident; that he himself received no medical attention after the incident; and that he saw plaintiff refuse medical treatment from paramedics.

On cross-examination, Ott stated that he never prepared any police report concerning plaintiff's intoxication.

Next, Charles Greinke testified that he is currently a part-time police officer employed by the Village of Crestwood. Greinke testified as to the normal arrest procedures following a traffic stop, stating that the dispatcher creates a card for each call and that, as a supervisor on the midnight shift, Greinke would pick up the cards from the dispatcher for use in preparation of his police reports. After that, the dispatcher cards are given to the clerk and kept in a file.

On August 12, 1990, the other officers present at the scene of the altercation between the Barres were Officers Vidales, DiVirgilio and Ott. Officer Vidales removed Leonard Barre from the scene; Greinke and Ott removed Pam Barre. While at the scene of the Barre dispute, another car came by and almost struck Ott and Pam while they stood on the roadway.

After receiving the call for assistance from DiVirgilio, Greinke proceeded to the location of DiVirgilio's police vehicle. Greinke observed DiVirgilio struggling with plaintiff after he and Ott exited their vehicle. The first time Greinke saw plaintiff, he was bent backwards over the trunk of his car and DiVirgilio was bending over plaintiff. Greinke did not see plaintiff strike DiVirgilio.

During the scuffle that ensued, plaintiff kicked Greinke in the knee. Even though at that time he was recovering from knee surgery, Greinke did not receive treatment from paramedics when he returned to the police station.

Greinke and Ott tried to detain plaintiff against the trunk of his car, but they were unable to handcuff him. Then one of the officers said "let's try to get him on the ground so we can get him cuffed." At one time all four men fell to the ground; Ott fell partially on top of Greinke and partially on top of plaintiff. But during this time, Greinke never saw plaintiff strike anybody.

Once the officers picked up plaintiff and placed him against his car, they handcuffed him. At that point, Greinke saw blood on the trunk of plaintiff's car. Greinke believed that plaintiff was hurt during the scuffle when the whole group fell to the ground.

Greinke visited the Barre home a number of times after the incident, sometimes dressed in his police uniform. After plaintiff filed his lawsuit, Greinke went to the Barre home on two more occasions to ask Leonard and Pam if they would testify. On cross-examination, Greinke testified that plaintiff was driving on Cal-Sag at approximately 60 miles per hour, in a 45-mile-per-hour zone.

Next, Christopher DiVirgilio testified that at the time of the incident his surname was Rodriguez, that he since had his name legally changed; and that the name change had nothing to do with this case. DiVirgilio stated that he is 6 feet 1 inch tall, 175 pounds and has not been trained in the martial arts. However, when asked whether, in plaintiff's criminal case, DiVirgilio testified that he in fact received training in the martial arts and self-defense, DiVirgilio stated that he did not give that answer. DiVirgilio stated that he has received training in self-defense and that he did a stint in the Marine Corps.

DiVirgilio stated that the holding room for arrestees at the Crestwood police department does not have bathroom facilities and is not equipped for overnight stays. Usually, if an arrestee is being held overnight, he or she is transferred out to the Oak Forest or Midlothian police department. In this case, plaintiff was transferred to Oak Forest. DiVirgilio transported plaintiff to his bond hearing at Markham, at approximately 8:30 a.m. on August 12, 1990.

At the time of the incident, DiVirgilio was the supervisor of the midnight shift. During the midnight shift, there was no dispatcher on duty at the Crestwood police department; for dispatch services, Crestwood Officers used the Midlothian police department. At the end of each shift, DiVirgilio arranged for the dispatcher cards to be picked up from Midlothian and brought back to the Crestwood police station. Although at plaintiff's criminal trial DiVirgilio testified that he did not believe that dispatcher cards were later destroyed, at this trial he admitted that the dispatcher card detailing plaintiff's arrest cannot now be located.

At the time of plaintiff's arrest, DiVirgilio had only made one prior arrest for driving under the influence. Also, DiVirgilio was the only full-time officer, as Officers Greinke and Ott were only part-time auxiliary officers who had not attended police academy.

As for the incident on the Cal-Sag, DiVirgilio stated that he arrived as a backup for the domestic dispute between the Barres. Once there, he saw plaintiff's vehicle come by nearly missing Ott and Pam Barre. Ott dove over the corner of a squad car to avoid being hit by plaintiff's car.

DiVirgilio pursued plaintiff in his squad car with his emergency lights activated. Plaintiff abruptly stopped in front of DiVirgilio, such that DiVirgilio almost hit the back of plaintiff's car. DiVirgilio radioed for backup, then approached plaintiff in his car and ordered him out. DiVirgilio searched plaintiff for weapons, and plaintiff did not resist. Then DiVirgilio escorted plaintiff to the passenger side of his squad car. DiVirgilio admitted that it was not the usual procedure on a traffic stop to order the driver out of his or her car. Plaintiff gave DiVirgilio his driver's license.

At some point thereafter, plaintiff started struggling with DiVirgilio, and DiVirgilio called to Greinke and Ott for assistance. DiVirgilio noticed a cut on plaintiff's head after plaintiff was detained and believed that plaintiff was injured when the group of men fell to the ground during the struggle. Once at the station, DiVirgilio also noticed that plaintiff had urinated on himself. DiVirgilio stated that the total time of the struggle between the officers and plaintiff was four to five minutes.

DiVirgilio noted in his police report that later in the evening he saw plaintiff crying. Plaintiff was bandaged by paramedics, although DiVirgilio wrote on his report that plaintiff was not injured.

On cross-examination, DiVirgilio testified that when he initially approached plaintiff, he detected a strong smell of alcohol on his breath and noticed that plaintiff was staggering. DiVirgilio escorted plaintiff to the squad car, where plaintiff waited in the passenger

seat while DiVirgilio made a visual inspection of plaintiff's vehicle. When DiVirgilio started to run a check of plaintiff's license, plaintiff got out of the squad car, walked toward DiVirgilio, and stated that DiVirgilio had no right to do this to him. DiVirgilio ordered plaintiff back to the squad car and plaintiff refused. At that point, DiVirgilio grabbed plaintiff by his arm and wrist and was going to escort him back to the squad car when plaintiff spun around and hit DiVirgilio in the chest. DiVirgilio backed into plaintiff's car and the two men faced each other. DiVirgilio then pushed plaintiff back and called on his radio for assistance. Then plaintiff came back at DiVirgilio, gave him a bear hug, and the two wrestled around on the ground. Greinke and Ott arrived about a minute later. At some point during the struggle, DiVirgilio's revolver fell out of its holster, but he did not make a note of it in his report.

DiVirgilio charged plaintiff with driving under the influence based on his observations at the scene and later at the police department. DiVirgilio stated that plaintiff was uncooperative with his arrest processing at the station and would not allow the officers to fingerprint him or take photographs. As a result, the officers transported plaintiff to Oak Forest. DiVirgilio denied making fun of plaintiff because he urinated in his pants.

Posen police officer David Vidales testified that, in August 1990, he was employed by the Crestwood police department. On August 12, 1990, he arrived at the scene of a domestic dispute on Cal-Sag, meeting Officers Greinke and Ott. Vidales saw plaintiff approach the scene traveling erratically and at a very high rate of speed. Vidales transported Leonard Barre to the Cocomos parking lot, during which time he heard DiVirgilio call for assistance on the police radio. Vidales activated his emergency lights and proceeded to a location at 131st Street and Cicero, south of Cal-Sag. When he arrived at the scene, he noticed three other police vehicles with emergency lights activated. Vidales approached the other officers and noticed a subject on the ground in handcuffs. Vidales transported plaintiff to the Crestwood police station.

Once there, Vidales called for an ambulance because plaintiff had blood on his face. Plaintiff was very uncooperative with the paramedics and verbally abused them. Vidales signed plaintiff's release from medical liability because plaintiff refused to sign it and refused to be transported or treated at the hospital. Vidales concluded that plaintiff was intoxicated, because his eyes were glassy, his breath smelled of alcohol, and his speech was slurred.

At the conclusion of the trial, the jury returned a verdict in favor of plaintiff and against DiVirgilio and Greinke. The jury awarded

plaintiff a total of $30,000: $5,000 for disfigurement resulting from his injuries; and $25,000 for pain and suffering experienced as a result of his injuries, apportioning the damages 20% to Greinke and 80% to DiVirgilio. The trial court entered judgment on the verdict on July 3, 1995. The trial court denied defendants' subsequent post-trial motion. Defendants filed a timely notice of appeal.

Initially, defendants contend that the jury verdict was contrary to the manifest weight of the evidence and the trial court erred in failing to enter judgment notwithstanding the verdict (judgment *n.o.v.*).

■ The standard for granting a directed verdict or judgment *n.o.v.* is whether the evidence, viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on the evidence could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967). A motion for a judgment notwithstanding the verdict presents a question of law and will be granted only if there is a total failure or lack of evidence to prove an essential element of the plaintiff's case. *Aguilera v. Mt. Sinai Hospital Medical Center*, 282 Ill. App. 3d 363, 668 N.E.2d 94 (1996); *Merlo v. Public Service Co.*, 381 Ill. 300, 45 N.E.2d 665 (1942). In making a determination to enter judgment *n.o.v.*, the trial court may not substitute its judgment for that of the jury as to the credibility of the witnesses, nor may the trial court determine the preponderance of the evidence. *In re Village of Bridgeview, Cook County, Illinois, Special Assessment*, 139 Ill. App. 3d 744, 753, 487 N.E.2d 1109 (1985).

■ In the present case, defendants argue that the trial court erred in refusing to enter judgment *n.o.v.* because plaintiff's testimony is inconsistent with that of defendants and other witnesses. Defendants cite several examples, including the difference between plaintiff's deposition testimony, where he stated that he did not know exactly when he urinated in his pants, and his trial testimony where he stated that he remembered doing so at the scene of the incident.

Defendants' argument is insufficient to support either entry of judgment *n.o.v.* or a directed verdict. Regardless of any inconsistencies in the testimony, the record shows that plaintiff was in fact injured as the result of more than one struggle with defendants, resulting in stitches to his head. Defendants have not shown that the jury verdict so overwhelmingly favored defendants that judgment should have been entered in their favor.

Next, defendants contend that they were denied a fair trial by the cumulative effect of improper trial testimony, including improper statements of plaintiff's counsel during closing argument. Defendants complain that certain statements by plaintiff's counsel inflamed the

passions of the jury. Plaintiff initially responds that defendants have waived this issue for review for failure to cite any authority in support of their multiple arguments, in violation of Supreme Court Rule 341(e)(7). 145 Ill. 2d R. 341(e)(7). In the alternative, plaintiff argues that any error was harmless.

Defendants first complain that the trial court erred in failing to grant their motion *in limine* to bar witness Leonard Barre from testifying that Greinke's visits to the Barre house to request their cooperation at trial constituted bribery. The record shows that the trial court agreed to limit Leonard's testimony regarding Greinke's visits to the Barre household as evidence against Greinke only and not against the other two police officers.

■ During the jury instruction conference, defense counsel requested that plaintiff counsel be barred from making any closing argument that Greinke's contact with Leonard Barre constituted a bribe. The trial court sustained plaintiff's objection to the use of the word "bribe," stating that there was no evidence that what Greinke did was a bribe. Subsequently, during closing argument, plaintiff's counsel made the following comment:

> "What else did you hear about this, their attempt to cover this thing up? Do you remember Leonard Barre, who came in here, the man in shorts. He went up on the stand and he talked about Officer Greinke coming out, visiting his home. And Officer Greinke didn't come once or twice, he came three, four times, sometimes driving in the squad car, coming up in full uniform, we need to talk to you. What did Officer Greinke ultimately say to him? He said, I really need you to testify in this case. If you have problems remembering, I'll help you out with your memory. And guess what? We will take care of you too. We will take care of you."

The trial court overruled defense counsel's objection to this comment, noting that it comported with the evidence at trial.

Deciding whether to admit evidence is within the sound discretion of the trial judge, and a reviewing court will not overturn that decision absent a clear abuse of discretion. *Gill v. Foster*, 157 Ill. 2d 304, 626 N.E.2d 190 (1993); *State Farm General Insurance Co. v. Best In The West Foods, Inc.*, 282 Ill. App. 3d 470, 667 N.E.2d 1340 (1996). In addition, the scope of closing argument is within the sound discretion of the trial court and the reviewing court will reverse only if the argument is prejudicial. *O'Neil v. Continental Bank, N.A.*, 278 Ill. App. 3d 327, 662 N.E.2d 489 (1996).

Defendants argue that Leonard's testimony never should have been admitted because it was potentially prejudicial and that a recap of the testimony during closing argument was in fact prejudicial.

Defendants cite no authority for their contention. Under this circumstance, defendants have failed to show that the trial court erred in admitting Leonard's testimony regarding Greinke's visits.

■ Defendants further contend that the trial court erred in denying defendants' motion *in limine* to bar any reference to the fact that neither DiVirgilio nor Ott was employed as a police officer at the time of trial. Defendants argued that this information unfairly implied that the defendants were discharged for misconduct related to the plaintiff's action. The trial court allowed evidence of the officers' employment status for the purpose of background information. Defendants argue that admission of the employment status of DiVirgilio and Ott allowed plaintiff's counsel to make the following inappropriate comment in closing argument:

> "Now, there's good and bad in every profession, and this is a situation where we have a bad cop, someone who doesn't belong out there, and he is not out there anymore, he is working—."

The trial court sustained defense counsel's objection to this statement, stating: "The objection is sustained. There's absolutely no evidence of that."

From the record, it is apparent that the trial court cured any prejudice when it sustained the objection. *Simon v. Van Steenlandt*, 278 Ill. App. 3d 1017, 664 N.E.2d 231 (1996).

■ Defendants further contend that the trial court erred in failing to grant their motion *in limine* to bar admission of the statement: "When you mess with a six degree blackbelt that's what's going to happen to you." The trial court ruled that the statement would be admissible if plaintiff's counsel could establish a sufficient foundation showing that the statement was made by one of the defendant officers and that they were the only individuals in the police station at the time the statement was made. The trial court initially found that a sufficient foundation was established during plaintiff's offer of proof that nobody was in the jail cell when plaintiff heard the statement and that only four police officers were present in the police station at the time the statement was made.

However, prior to closing argument, the trial court granted defense counsel's request to strike the statement in its entirety because the plaintiff failed to show that the statement was an admission by any of the three defendants. The trial court agreed to instruct the jury that even though it heard certain statements, the court has ruled that the jury is not to use the statements against any defendant. Defense counsel did not want the jury to hear the statement again and requested that the trial court not repeat the statement in order to instruct the jury to disregard the statement.

Under the circumstances described, defendants have failed to show that the initial admission of the statement denied them a fair trial. Plaintiff never presented any evidence that any of the three defendants actually made the statement. Moreover, defendants refused a limiting instruction, which would have cured any error in the admission of the statement, thereby waiving the issue for review.

Defendants have waived any issue regarding DiVirgilio's alleged training in the martial arts for failure to object to the relevant questions at trial.

■ Defendants further contend that the jury's award of $25,000 was excessive because plaintiff failed to testify that he experienced any pain and suffering.

Damages for pain and suffering are proper where there is evidence of a physical injury. *Haudrich v. Howmedica, Inc.*, 169 Ill. 2d 525, 662 N.E.2d 1248 (1996). Evidence of pain and suffering may be elicited from the plaintiff, rendered by an expert or inferred from the nature of the injury. *Neyzelman v. Treitman*, 273 Ill. App. 3d 511, 518, 652 N.E.2d 1300 (1995). In addition, where future pain and suffering can be objectively determined from the nature of an injury, the jury may be instructed on future pain and suffering based on lay testimony alone or even in the absence of any testimony on the subject. *Maddox v. Rozek*, 265 Ill. App. 3d 1007, 639 N.E.2d 164 (1994).

In the present case, the evidence revealed that defendant suffered a head injury that required five stitches. Therefore, the matter of pain and suffering was properly before the jury. Defendants further complain without any citation to authority that improper jury instructions contributed to the cumulative trial error. This contention is waived for failure to cite to appropriate authority.

In defendants' final contention of trial error, they cite to multiple statements made in closing argument, some of which have already been discussed. Defendants provide a "list of inflammatory and prejudicial comments" made by plaintiff's counsel with virtually no citation to authority explaining how these comments constituted reversible error.

Defendants have failed to show that the jury verdict was against the manifest weight of the evidence or that the alleged trail errors cumulatively require a new trial. For the reasons stated above, we therefore affirm the judgment of the trial court.

Affirmed.

BUCKLEY and GALLAGHER, JJ., concur.