2024 IL App (1st) 230935

SIXTH DIVISION
February 23, 2024

No. 1-23-0935

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court of Cook County Domestic Relations Division |
| JOAN DOE, | ) ) ) | |
| Petitioner-Appellee, | ) ) | |
| and | ) ) | No. 2019 D 53086 |
| JOHN DOE, | ) ) ) | The Honorable Renee Jackson, Judge Presiding. |
| Respondent-Appellant. | ) ) | |

JUSTICE TAILOR delivered the judgment of the court, with opinion.
Justice C.A. Walker concurred in the judgment and opinion.
Presiding Justice Oden Johnson concurred in part and dissented in part.

**OPINION**

¶ 1 This appeal is from an order granting a mother's petition on behalf of her daughter for a plenary order of protection against the father under the Illinois Domestic Violence Act of 1986 (Domestic Violence Act) (750 ILCS 60/101 *et seq.* (West 2022)). The mother and father divorced in 2020, and the petition for a protection order was filed in 2021. The petition alleged that the father had sexually abused his daughter over a number of years, beginning when she was in the fourth grade. By the time of the hearing on the mother's petition, the daughter was 18 years old. Concerned about re-traumatizing the daughter, the trial court, at the mother's request, invoked a

provision of divorce law permitting a trial court to question a child *in camera* about her preference regarding allocation of parental responsibility. The trial court interviewed the daughter *in camera* about her claims of sexual abuse and denied the father's attorney the opportunity to cross-examine the daughter.

¶ 2     We hold that this procedure violated the father's due process rights. The only evidence that the father sexually abused his daughter was the daughter's testimony, yet he was prevented from challenging her credibility through cross-examination. There were other options available to the court that could have protected the daughter from reliving any trauma without depriving the father of his due process rights. Because this case hinged almost entirely on the daughter's testimony, this error was not harmless. Therefore, we reverse the trial court's decision to grant the plenary order of protection and remand for a new hearing.

¶ 3                              I. BACKGROUND

¶ 4     Joan Doe and John Doe were married on September 5, 2008, and they had four children together: J.T, C.T., Cy. T. and Jo. T. In April 2019, Joan learned that her husband had been having an affair with another woman. Shortly thereafter, John moved out of the marital residence he and Joan shared with their children, and Joan filed for divorce. After John left, he had almost no contact with his children.

¶ 5     John and Joan's divorce was finalized on December 14, 2020. Their agreed parenting plan, which was entered on March 3, 2020, allowed John after-school parenting time with his younger children, Cy. T. and Jo. T., Monday through Friday, and flexible parenting time with his two older children, J.T. and C.T.

¶ 6     On March 2, 2021, John sent an e-mail to Joan, asking if he could take their youngest daughter, Cy. T., out for her birthday. Joan said no because she already had a full day of activities

planned with Cy. T, but she told John he could join her and the kids to celebrate at her home. John said that he would rather see Cy. T. "alone with [his] other kids[,]" and that he would see them at a later date.

¶ 7 When C.T., who was 16 at the time, learned about her father's request to spend time alone with Cy. T., she became worried for her younger sister. Soon after, she disclosed to her grandfather that her father, John, had sexually abused her when she was younger, starting in the fourth grade.

¶ 8 Several weeks after C.T.'s outcry to her grandfather, C.T. and her mother filed a police report. The Children's Advocacy Center conducted victim sensitive interviews (VSIs) with C.T. and her siblings. On July 8, 2021, the Department of Children & Family Services (DCFS) indicated John for sexual penetration and sexual molestation of C.T. and a "substantial risk of sexual abuse" to J.T., Cy. T., and Jo. T.

¶ 9 On July 26, 2021, John was arrested and interrogated by detectives about the allegations C.T. had made against him. John denied ever sexually molesting C.T. After concluding the interview, the State decided not to bring any criminal charges against John.

¶ 10 On July 27, 2021, Joan filed a petition for an emergency order of protection against John. The petition described several instances of John sexually abusing C.T., including touching her breast, butt, and vagina in 2015, attempting to penetrate C.T. with his penis in 2016, forcing C.T. to stroke his penis in 2016, and setting up a hidden phone to record C.T. taking a shower in 2018. The court issued the emergency protection order that same day. The order included C.T. and her three siblings as protected parties and denied John all parenting time.

¶ 11 On September 10, 2021, the court appointed a guardian *ad litem* (GAL), Angel Traub, to represent C.T.'s interests. On November 15, 2021, after retaining counsel, Joan amended her

petition for a protection order to clarify that she was petitioning on behalf of her minor daughter, C.T.

¶ 12    On October 17, 2022, Joan filed a motion for C.T.'s testimony to be presented in chambers. She argued that due to C.T.'s age and the sensitive nature of C.T.'s allegations of sexual abuse, it was in her best interest for the court to examine her in chambers. John objected. He argued that because the order of protection was brought under the Domestic Violence Act, which does not include a provision authorizing *in camera* examinations of witnesses, it would be improper for the court to conduct an *in camera* examination of C.T. In addition, he argued that it was "a matter of fundamental fairness and due process that this important witness be subject to cross examination in the ordinary course of testimony." He also asked the court to compel C.T.'s deposition.

¶ 13    On November 15, 2022, the court granted Joan's motion, reasoning that it had authority to conduct an *in camera* examination of C.T. because the case was before it due to the parties' prior dissolution case, and the Illinois Marriage and Dissolution of Marriage Act (Marriage Act) (750 ILCS 5/101 *et seq.* (West 2022)) "always permitted the [court] discretion to do what [it] feel[s] is in the best interest of a child." The court also refused to allow John to depose C.T. John filed a motion to reconsider, but the court denied it, stating that it would not be in C.T.'s "best interest to have her on the stand being cross-examined," noting, "she's still a child."

¶ 14    The court then scheduled a number of hearing dates on the plenary order of protection beginning in December 2022. Over the course of several months, the court heard testimony from Joan and John; their oldest son, J.T.; C.T.'s grandfather; several detectives who spoke with Joan; GAL Traub; and former GAL Lester Barclay, who had worked with the family during the parties' dissolution proceedings. The parties also submitted stipulations regarding testimony from several detectives who spoke with Joan, C.T., and C.T.'s grandfather.

¶ 15    John and Joan's oldest son, J.T., testified first. He stated that in January 2018, his sister, C.T., came out of the bathroom and told him that she was being recorded in the bathroom on her dad's cell phone. He said she told him not to tell anyone else about it. He said that, in the summer of 2020, C.T. told him "everything that [their] dad did to her", which caused him to feel "disgusted," but again he did not tell anyone because C.T. asked him not to. He admitted that he was confused when C.T.'s allegations surfaced, because he never saw his dad touch his C.T. in an inappropriate way or heard about anything that had happened between them. However, he said that when they were in high school, he remembered his dad "looking at [C.T.'s] butt" when they went to an indoor trampoline park called Sky Zone and "look[ing] at her like a pedophile."

¶ 16    Detective Maureen Donohoe from the Cook County Sheriff's Department testified next. She said she understood that C.T.'s allegations against her father came out because C.T.'s grandfather was concerned about her so he pulled her aside and asked her a few questions, which prompted C.T.'s outcry. She also testified that on July 26, 2021, when John was arrested and brought in for questioning about C.T.'s allegations, he cooperated fully and did not ask for a lawyer after he was read his *Miranda* rights. She said that John was "upset" and "taken aback" when he was confronted with C.T.'s allegations and that he denied ever touching C.T. Donohoe said that she showed the state's attorney's office the notes from her interview with John and that the State subsequently decided not to file any charges against him. Her interview note from July 26, 2021, says that the charges were not approved due to an "issue of credibility."

¶ 17    Detective Beverly Austin from the Cook County Sheriff's Department, the lead detective on the case, testified next. She reviewed body-worn camera footage from Officer Senese, who spoke to Joan on April 9, 2021, about C.T.'s allegations against her father. The footage shows C.T. sitting beside her mother during this interview.

¶ 18    C.T.'s grandfather testified next. He said C.T. seemed "sad about some things" and "distant" and that this was unusual for her. He also noticed that C.T had been losing weight, which concerned him. In March 2021, he said he saw C.T. sitting and crying on her bed so he asked her what was going on and why she was crying. He said they talked about what was wrong, and afterwards, he told C.T. they would need to tell Joan. He told Joan what C.T. said to him and told Joan she should report C.T.'s allegations to the police.

¶ 19    GAL Traub testified next. She had been appointed by the court in connection with the order of protection and was tasked with speaking to C.T. to determine whether the protection order should be extended. She spoke with John, Joan, C.T., C.T.'s brother J.T., and with DCFS. She admitted that she did not find any witnesses who had seen John touch C.T. in an inappropriate or sexual manner but stated that in her 16 years as a GAL, it was "rare beyond rare" for someone to have actually witnessed sex abuse. She said that C.T.'s statements to her and various other people were "fully consistent" and that C.T.'s testimony did not seem coached. She said that when she spoke with Joan, Joan expressed "shock and concern for her daughter." By contrast, when she spoke to John about C.T.'s allegations, he told her C.T. "made it up" and called her a liar. He expressed no concern for C.T., and Traub's impression of his general care and concern for his children was that it was "very low." Traub noted in her report that John "rarely" made attempts to have parenting time with any of his children despite the visitation schedule that the parties had agreed to in March 2020, which permitted John to pick up the two younger children after school Monday through Friday, to pick up his two older children from their after-school activities when needed, and which allowed other parenting time to be "mutually arranged between the parties with the goal of reestablishing father's relationship with all four minors."

¶ 20    Traub also reviewed the outcome of the DCFS investigation, which indicated five findings against John: one for sexual penetration; one for sexual molestation; and three for substantial risk of sex abuse to a sibling of a victim, one for each of C.T.'s three siblings. Traub stated that she "put a lot of weight on a DCFS indicated finding" of sexual abuse because "the victim sensitive interviewers are highly trained." She recommended that "the order of protection become a plenary order of protection and extended for the full length of time in which it can be, *** and that it protect all of the minor children, including [C.T.] and her little sister and brother." Traub also recommended that John's parenting time be suspended under the protection order "until and of such time that he completes a sex offender evaluation and also gets sex offender treatment and follows any recommendations that are provided in the sex offender evaluation, which typically is counseling and some other things."

¶ 21    The court then conducted an *in camera* interview with C.T. In advance, the court allowed the parties' attorneys to submit 20 questions each that they wanted asked. The attorneys were allowed to be present for the interview, and the court questioned C.T., relying in part on the questions the attorneys had submitted. C.T. told the court that her father molested her. She said he "put his fingers" in her and was "grabbing [her] butt and [her] boobs when [she] was younger" and "almost put his private part in [her] one time." She could not remember the dates these incidents occurred, but said they took place when her family used to live in a hotel and that this would happen "all the time in the pool." C.T. also said her father "touch[ed] [her] at [their] old apartment." She testified that he thrust his penis against her back and put his hands down her pants. She said he touched her butt once at a gun range, but she did not tell anyone because her father told her it would break up their family if she did and it would be all her fault. C.T. told the court she finally chose to say something because her dad wanted to take her younger sister out for her

birthday and she "f[elt] like he [was] going to do something to her" too. She said, "I don't want my sister to feel the way I felt back when that happened. I was going through depression. I don't want her to ever deal with that." She told the court she "would never lie about anything like this" and said "what my dad did it's sad. He needs help. And jail."

¶ 22    Joan testified next. She said she told John to leave the house in April 2019 after she found out he had been cheating on her. After he left, John only saw the kids once or twice, and the children were upset about this and wondered why he was not coming to see them. She and John divorced towards the end of 2020. At the beginning of 2021, Joan noticed a change in C.T. She was depressed, not eating, and seemed kind of stand-offish. Joan said that after she learned of C.T.'s allegations, she reported them to the police. After the police declined to prosecute John, Joan filed for an order of protection based on what C.T. told her. She said that the primary purpose of the protection order was to protect C.T. and her other children. Joan admitted that she never saw John touch C.T. inappropriately.

¶ 23    GAL Barclay testified next. He was appointed GAL during the parties' divorce proceedings. He said he met with Joan and her kids in January 2020. He felt that the relationship between John and his children was "fractured" and that John needed to work on repairing his relationship with them, both by spending time with them as a group and one-on-one. GAL Barclay was discharged from his duties by the court in March 2020.

¶ 24    John testified last. He said he moved out of the house he shared with Joan and their kids in April 2019 and had "no contact" with his kids afterwards. He said he asked to have one-on-one time with his youngest daughter for her birthday because of the recommendations from GAL Barclay. He said he first learned about C.T.'s allegations of abuse after he was arrested. He denied ever touching C.T. in an inappropriate way and all allegations of sexual abuse.

¶ 25    On May 4, 2023, the court issued a two-year plenary order of protection. The court stated that,

> "it ha[d] considered the nature, frequency, severity, pattern, and consequences of the alleged past abuse and believes that—I'm just going to term it like this for now—that this family requires the protection of an order of protection; of a plenary order of protection. The Court finds that abuse did occur with [C.T.] The Court found the testimony of [C.T.] via her in camera to be absolutely credible. The Court finds that . . . the circumstantial evidence that was presented—I find that to be credible and so, the Court finds that the conduct or actions of [John] unless prohibited will likely cause irreparable harm or continued abuse and for that reason, this Court will enter a two-year plenary order of protection."

¶ 26    The court also ruled that John should have no parenting time with Cy. T. and Jo. T until further order of court, ordered John to participate in sex offender therapy, and ordered that the parties return in six months to determine whether reunification therapy would begin. John now appeals the trial court's order.

¶ 27                                    II. ANALYSIS

¶ 28    This Court has jurisdiction over this appeal pursuant to Illinois Supreme Court Rule 307(a)(1), which permits appeals from trial court orders "granting, modifying, refusing, dissolving, or refusing to dissolve or modify an injunction." Ill. S. Ct. R. 307(a)(1) (eff. Nov. 1, 2017). On May 4, 2023, the trial court granted Joa's petition for a plenary order of protection, an injunctive order. See *In re Marriage of Fischer*, 228 Ill. App. 3d 482, 486-87 (1992) ("An order of protection is an injunctive order because it directs a person to refrain from doing something, such as to refrain

from entering or residing where he or she lived before the order was entered."); *In re Marriage of Padilla*, 2017 IL App (1st) 170215, ¶ 17. John timely appealed.

¶ 29  On appeal, John argues that the trial court failed to conduct the requisite analysis and that its decision to grant the order of protection was against the manifest weight of the evidence. In addition, he argues that the trial court misused the Domestic Violence Act to effectuate a change in custody, that it reversibly erred when it denied his motion to compel the deposition of C.T., and that its decision to conduct an *in camera* examination of C.T.—which precluded him from cross-examining her—violated his due process rights. We address John's argument that the judgment is against the manifest weight of the evidence first because, if successful, it negates the need for a new hearing, making his other claims of error on appeal moot.

¶ 30  A. The Trial Court's Decision to Grant the Plenary Order of Protection Was Not Against the Manifest Weight of the Evidence and Otherwise Satisfied the Requirements of Section 214(c)

¶ 31  John first argues that the trial court reversibly erred when it granted the plenary order of protection "given the insufficiency of the evidence supporting the allegations." He also argues that the trial court "failed to conduct a meaningful analysis" of the factors required by the Domestic Violence Act.

¶ 32  To issue an order of protection under the Domestic Violence Act, a trial court must find that the petitioner has been abused by a preponderance of the evidence. See 750 ILCS 60/214(a) (West 2022); *Best v. Best*, 223 Ill. 2d 342, 348 (2006). The trial court must make findings that (i) it considered the factors in sections 214(c)(1) and 214(c)(2) (750 ILCS 60/214(c)(1), (2) (West 2022)), (ii) the respondent's conduct will likely cause irreparable harm or continued abuse, and

(iii) granting the requested relief would protect the petitioner or other allegedly abused persons. *Id.* § 214(c)(3); *In re Marriage of Henry*, 297 Ill. App. 3d 139, 143 (1998).

¶ 33    Here, the trial court's decision satisfied the requirements of section 214(c). The court stated that it had "considered the nature, frequency, severity, pattern, and consequences of the alleged past abuse," concluded that the "conduct or actions of [John] unless prohibited will likely cause irreparable harm or continued abuse," and found that the family "requires the protection of an order of protection." See *In re Marriage of McCoy*, 253 Ill. App. 3d 958, 965 (1993) (stating that "[a] reviewing court will not overturn an order for lack of greater specificity when the record supports the statutorily required findings"). Thus, the court did all that was required under the statute. See *Landmann v. Landmann*, 2019 IL App (5th) 180137, ¶¶ 17-19 (reversing and remanding because the trial court "made no findings, written or oral, regarding the relevant factors are required by section 214(c)(3)(i)").

¶ 34    We now turn to the sufficiency of the evidence. When a trial court makes findings of abuse under the Domestic Violence Act, we will reverse only if its findings are against the manifest weight of the evidence. *Best*, 223 Ill. 2d at 348-49. A court's findings are against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the findings are unreasonable, arbitrary, or not based on the evidence presented. *Id.* at 350. The manifest weight standard gives deference to the trial court as finder of fact, because it is "in the best position to observe the conduct and demeanor of the parties and witnesses." *Id.* A reviewing court "must not substitute its judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn." *In re D.F.*, 201 Ill. 2d 476, 499 (2002).

¶ 35    Here, the trial court based its decision primarily upon C.T.'s testimony, which it found "absolutely credible." C.T.'s testimony, standing alone, was sufficient to support the trial court's

abuse finding. See *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228-30 (2009) (finding that a single witness's testimony was sufficient to uphold a conviction for sexual assault when the trial court found the witness credible, despite the defendant's assertions that her story was "deficient," "fantastical," and "unbelievable"). Although John argues that C.T.'s "vague and conclusory testimony is insufficient" to meet her burden, C.T. was able to identify the places where the sexual abuse occurred, describe several instances of abuse with some specificity, and tie many of the instances of abuse to a specific year or grade level. Although she was unable to provide specific dates for certain instances of abuse, this is not uncommon in child sexual abuse cases. See, *e.g.*, *People v. Bishop*, 218 Ill. 2d 232, 247 (2006) ("it is often difficult in the prosecution of child sexual abuse cases to pin down the times, dates, and places of sexual assaults, particularly when the defendant has engaged in a number of acts over a prolonged period of time"). In addition, C.T. made an immediate outcry in one instance to her older brother, J.T., who testified that in 2018, C.T. told him that their father had been recording her in the bathroom with his phone as she was preparing to shower.

¶ 36    The fact that there was an otherwise delayed outcry in this case does not undermine the trial court's finding, as delayed outcry for victims of sexual assault is not uncommon, especially for children. See *People v. Priola*, 203 Ill. App. 3d 401, 414 (1990) ("[T]he failure of a young sexual assault victim to make a prompt complaint is easily understandable because of the natural sense of shame, fear, revulsion, and embarrassment felt by children under such circumstances."); see also *People v. Duplessis*, 248 Ill. App. 3d 195, 199-200 (1993) ("In sexual assault cases involving family relationships, the victim's credibility is not lessened if there is no immediate outcry."). The fact that there were no witnesses to the alleged abuse or any physical evidence of abuse does not undermine the trial court's finding either. GAL Traub testified that in her 16 years

as a GAL, it was "rare beyond rare" for a witness to observe incidents of sexual abuse, and Joan said she did not bother to bring C.T. in for a forensic medical examination because the abuse occurred years before C.T.'s outcry and Joan "didn't think [the medical examiners] would find anything."

¶ 37    John argues that inconsistencies in C.T.'s story and with other witnesses demonstrate that the court's finding of abuse was against the manifest weight of the evidence. However, this court has repeatedly upheld trial courts' findings of abuse despite inconsistencies. See, *e.g.*, *In re S.M.*, 171 Ill. App. 3d 361, 366 (1988) (upholding the trial court's finding of abuse even though the trial court acknowledged inconsistencies in the minor's testimony and the lack of corroboration); *In re T.H.*, 148 Ill. App. 3d 877, 882-83 (1986) (deferring to the trial court's finding of abuse even though the "stories told by the children differ in details both major and minor" and there was a "glaring lack of evidence as to how the touchings occurred, who was present and what forms the touchings took").

¶ 38    Other evidence at trial supported the trial court's decision. GAL Traub interviewed C.T. several times and reviewed her video recorded VSI. She also interviewed Joan, J.T., and C.T.'s grandfather and testified that C.T.'s statements about what happened to her were "fully consistent" with those of her family members. "In cases involving the credibility of children who testify as to sexual abuse, the trial court must have broad discretion to reach a just determination, and a finding of abuse by the trial court is entitled to great deference." *In re Carlenn H.*, 186 Ill. App. 3d 535, 539-40 (1989). Because the trial court was in the best position to observe the conduct of the witnesses and to make judgments about their credibility, we defer to its judgments and find that its decision was not against the manifest weight of the evidence.

¶ 39              B. The Court Properly Denied John Parenting Time

¶ 40    John argues that because the "primary purpose" of the order of protection was to deny him parenting time rather than prevent abuse, it was improper for Joan to use the Domestic Violence Act to achieve that result. He argues that Joan should have attempted to modify custody under the Marriage Act instead.

¶ 41    For support, John relies upon *Wilson v. Jackson*, 312 Ill. App. 3d 1156 (2000), *In re Marriage of Gordon*, 233 Ill. App. 3d 617 (1992), *In re Marriage of Potenza*, 2020 IL App (1st) 192454, and *Radke v. Radke*, 349 Ill. App. 3d 264 (2004). However, these cases are distinguishable because, in each of them, the court found that there was either no evidence of abuse to support the issuance of a protection order under the Domestic Violence Act or that the "primary objective of the party seeking an order of protection [was] really to interfere with or change a child custody or visitation order." *Sutherlin v. Sutherlin*, 363 Ill. App. 3d 691, 695 (2005); see *Wilson*, 312 Ill. App. 3d at 1164-65 (based on "[a] careful review of the entire record" and finding a "dearth of evidence of abuse," the court concluded that "petitioner's primary purpose in seeking an order of protection was not to prevent abuse but was to obtain visitation with and custody of the child"); *In re Marriage of Gordon*, 233 Ill. App. 3d at 626-27 (stating that "our review of all the proceedings discloses that a change of custody was the purpose of the petition" and that the petition for a protection order under the Domestic Violence Act was merely "a subterfuge to permit [the child's father] to circumvent the requirements" under the Marriage Act); *In re Marriage of Potenza*, 2020 IL App (1st) 192454, ¶¶ 21, 56-57 (reversing the trial court's order in part where the father alleged in his petition for a protection order that his ex-wife had harassed him by " 'preventing [his] parenting time,' " reasoning that "[o]btaining an order of protection is not the proper procedure for resolving child custody or visitation issues"); *Radke*, 349 Ill. App. 3d at 269 (concluding that the mother "misused the Domestic Violence Act for the purpose of attempting to alter [father's]

visitation with [their daughter]" when the mother "admitted that she obtained the order of protection to temporarily suspend visitation" and the daughter "indicated that the order of protection was sought so that she could see her father only when she wanted to see him"). Here, by contrast, Joan testified that she sought the protection order because she was "trying to protect [her] children now that [she knew] what [John had] done to [C.T.]." She explained that she was asking for John's parenting time with her children to be denied because she "d[id]n't want there to be a repeat" and she "d[id]n't want the same thing to happen to them that happened to [C.T.]." She said she was filing the petition for a protection order "to protect [her two youngest children] so that they don't have to grow up and heal from the same thing that [C.T.] is trying to heal from today." Despite John's assertions to the contrary, there is ample evidence in the record establishing that Joan's primary purpose in seeking the order of protection was not to effectuate a change in custody, especially because she had been the sole custodian of her children since John left in April 2019, but to protect them from any future abuse.

¶ 42    Moreover, the Domestic Violence Act expressly allows a court to determine parenting time in connection with the issuance of an order of protection. The statute says that the court "shall restrict or deny *** parenting time *** if the court finds that respondent has done or is likely to *** abuse or endanger the minor child during parenting time" or "otherwise act in a manner that is not in the best interests of the minor child." 750 ILCS 60/214(b)(7) (West 2022). Here, the court concluded that John abused C.T. and that he was likely to abuse her or her minor siblings during his parenting time or otherwise act in a manner not in their best interests. See *Mowen v. Holland*, 336 Ill. App. 3d 368, 375 (2003) ("When one child in a household has been abused, a presumption arises that the environment in the household is injurious to the other minors therein."). Therefore, the court was well within its discretion to restrict John's parenting time under the Domestic

Violence Act. See *In re Marriage of Gilbert*, 355 Ill. App. 3d 104, 115 (2004) (upholding the trial court's issuance of an order of protection brought under the Domestic Violence Act that altered the visitation rights determined in the parties' dissolution proceedings after the trial court determined that one of the children had been abused by her father).

¶ 43    C. The Court Did Not Abuse Its Discretion When It Denied John's Motion to Compel the Deposition of C.T.

¶ 44    On November 9, 2022, John filed a motion to compel the deposition of C.T. He noted that C.T. made "serious allegations of sexual abuse" against him in the pending petition for an order of protection, and for that reason, it was necessary for him to depose her. In response, Joan filed a motion for C.T.'s trial testimony to be presented in chambers, arguing that,

> "due to the sensitive nature of [C.T.'s] testimony, that fact that [C.T.] is making these allegations against her father, and her young age, testifying in open court is likely to cause significant emotional distress to [C.T.]. It is in [C.T.'s] best interest for this Court to interview her in camera outside the presence of her parents *** An in camera interview, moderated by this court, is the best setting to elicit [C.T.'s] honest and complete testimony."

Joan added that "[b]oth parties have attorneys who can be present in chambers *** along with the assistance of a court reporter."

¶ 45    John argued in response that Joan brought her petition for order of protection under the Domestic Violence Act, which does not include any provision authorizing the *in camera* examination of a witness, and that "if the legislature had intended to include such a provision in the [Domestic Violence Act] it would have done so." He also noted that C.T. was 18 years old and "competent to testify[,]" and that because the trial was going to proceed to hearing remotely over

the Zoom platform, C.T. would not have to be in the same room as him or testify in open court. He stated that C.T. could testify in the GAL's office if she needed someone there for moral support, and that this would balance his due process rights and address the trial court's concerns about C.T. having to relive any trauma. John argued that "there are very important issues in this case involving delayed outcry, lack of corroboration and issues of credibility" and that "[a]s such, it is a matter of fundamental fairness and due process that this important witness be subject to cross examination in the ordinary course of testimony."

¶ 46    On November 15, 2022, the court granted Joan's motion to conduct an *in camera* examination of C.T. and denied John's motion to compel the deposition of C.T. It explained that if "[C.T.] were to be on the stand [or] if she were to be deposed she would certainly be retraumatized. And the Court would not have as much control over the events that normally occur in a deposition and normally occur when a person is on the stand." The court said it would "allow the attorneys" to be present for the *in camera* interview and said they could each "submit *** 20 questions to ask of the minor child." The court emphasized that "the point of the in camera is to provide a safeguard to the minor child" and to "limit the trauma that will come from having to relive this." The court noted that "the reason that this case is before me is because the parties were previously married" and that "any time a case is before me subject to the [Marriage Act] I am always *** permitted the discretion to do what I feel is in the best interest of the child."

¶ 47    John filed a motion to reconsider. After hearing arguments from the parties, the court denied the motion, reasoning that the Marriage Act is to be "liberally construed" and that under the Marriage Act, "the determination of the children's best interest and the allocation of parental responsibilities are paramount responsibilities in our system of justice." It said it did not "find that it would be in [C.T.'s] best interest to have her on the stand being cross-examined." It said it would

conduct an *in camera* interview of C.T., in person, with the attorneys sitting in the gallery within earshot. It allowed the attorneys to submit 20 questions that they wanted asked but stated, "just so you know if I find the question to be more of a cross examination question I am not going to ask the question that way. I will figure out a different way to ask the question that is not combative."

¶ 48    On February 10, 2023, the court conducted an *in camera* interview of C.T., relying in part on the questions it had received from counsel. After the court finished questioning C.T, it stated to the attorneys, "I think I got through everyone's questions. Yes?" John's attorney asked the court to ask questions 11, 12, 13, and 18 from his list of 20 questions. The court said it would ask questions 11 through 13, but said C.T. had already responded to question 18. The court asked several additional questions and then concluded the interview.

¶ 49    On appeal, John argues that there was "no legal basis or authority for the trial court to conduct the in camera examination of the 18-year-old complainant in an order of protection hearing under the [Domestic Violence Act]" or "to bar [him] from conducting the deposition or cross-examination of the complainant."

¶ 50    We find that the court did not abuse its discretion in denying John an opportunity to depose C.T. "A trial court has great latitude in ruling on discovery matters." *Country Mutual Insurance Co. v. Olsak*, 391 Ill. App. 3d 295, 307 (2009). Because "the trial court is in the best position to weigh fairly the competing needs and interests of parties affected by the discovery," we will not reverse absent an abuse of discretion "affirmatively and clearly shown by appellant." *Avery v. Sabbia*, 301 Ill. App. 3d 839, 844-45 (1998).

¶ 51    Under Illinois Supreme Court Rule 201(c), the trial court may "make a protective order as justice requires, denying, limiting, conditioning, or regulating discovery to prevent unreasonable annoyance, expense, embarrassment, disadvantage, or oppression." Ill. S. Ct. R. 201(c)(1) (eff.

Mar. 17, 2023). This rule "permits the court to issue a protective order as justice requires." *Doe v. Board of Education of Chicago*, 2017 IL App (1st) 150109, ¶ 16. Minors "are entitled to special protection by the courts." *Brandon v. DeBusk*, 85 Ill. App. 3d 645, 648 (1980*)* (reversing the trial court's decision to dismiss the minors' cases due to the minors' representative's failure to comply with discovery, reasoning that courts must ensure that minors' "rights are protected even from the neglect of their representative in order to do substantial justice").

¶ 52    In this case, the trial court refused to allow C.T. to be deposed due to concerns that "she would certainly be retraumatized." The court explained that it aimed to "limit the trauma that will come from [C.T.] having to relive this" and said it was doing what it felt was in C.T.'s best interests. John argues that without this deposition, he was unable to "properly prepare for trial" or "ascertain the evidence against him[,]" but he admits that he was able to review C.T.'s VSI and the police reports before trial. Therefore, we are unpersuaded by this argument. Moreover, because of the broad discretion afforded to trial courts in discovery matters and the court's heightened duty to afford special protection to minors, we find that the trial court did not abuse its discretion when it denied John's motion to compel C.T.'s deposition testimony based on its concerns that doing so could retraumatize her. We hasten to add, however, that our decision is based on the highly deferential standard of review and that our holding should not be interpreted to prohibit the deposition of all minors in cases alleging sexual abuse.

¶ 53    D. The Trial Court's Decision to Deny John's Attorney an Opportunity to Cross-Examine

C.T. Violated John's Due Process Rights

¶ 54    John also argues that the trial court erred when it conducted an *in camera* interview with C.T. because the Domestic Violence Act and the rules of civil procedure do not allow it, the Marriage Act does not apply to petitions for protection orders brought under the Domestic

Violence Act, and that barring him from cross-examining C.T. violated his due process rights. Joan argues that John forfeited this argument by "participating in the in camera examination without contemporaneous objection." She alternatively argues that the court properly exercised its discretion to conduct an *in camera* examination of C.T., and that even if this was improper, any error was harmless.

¶ 55    As a threshold matter, we reject Joan's forfeiture argument. Once the trial court has definitively ruled on a matter, "a party is entitled to assume that the trial judge will continue to make the same ruling and that he need not repeat the objection." *Spyrka v. County of Cook*, 366 Ill. App. 3d 156, 165 (2006). Here, the trial court granted Joan's request for an *in camera* examination of C.T. over John's objections. John then filed a motion to reconsider, which the trial court denied. This sufficed to preserve his objection on appeal.

¶ 56    Turning to the merits, we note that the Domestic Violence Act does not contain a provision permitting *in camera* examinations of witnesses. See 750 ILCS 60/101 *et seq.* (West 2022). Nor do the Illinois rules of civil procedure, which govern proceedings to obtain, modify, reopen or appeal orders of protection. *Best*, 223 Ill. 2d at 348. Here, the court reasoned that it had authority under the Marriage Act to interview C.T. in chambers, because the Marriage Act permits a "child" to be interviewed in chambers "to ascertain the child's wishes as to the allocation of parental responsibilities." 750 ILCS 5/604.10(a) (West 2022). However, the "purpose of the *in camera* interview procedure is to permit the court to ascertain the [child's] preferences free from the pressures and acrimony of open court." *In re Marriage of Hindenburg*, 227 Ill. App. 3d 228, 231 (1992). *In re Marriage of Agers*, 2013 IL App (5th) 120375, ¶ 25, is particularly instructive. There, the trial court found that an *in camera* interview of a five-year-old minor who was allegedly sexually abused by her father was not warranted when the intended

purpose of the interview exceeded the scope of the statute. Shortly after the mother and father divorced, the mother moved to terminate the father's visitation with their five-year-old daughter based on allegations that he sexually abused their daughter. *Id.* ¶ 5. The mother moved the trial court to interview her daughter *in camera*, but the father objected, arguing that their daughter should be subject to cross-examination on the sexual abuse allegations. *Id.* ¶ 6. The trial court denied the mother's motion for an *in camera* interview because the mother's desire was "to have [their daughter] tell the trial court what [the father] allegedly did to her, not to ascertain [the daughter's] wishes about visitation." *Id.* ¶ 25. On appeal, we affirmed the trial court's decision to deny the request for an *in camera* interview, finding no abuse of discretion. *Id.*

¶ 57    We conclude that the trial court's decision to interview C.T. *in camera* here for the purpose of C.T. describing John's sexual abuse exceeds the scope of section 604.10 of the Marriage Act. C.T.'s testimony had nothing to do with her preference regarding allocation of parental responsibility, which in this case had already been allocated to Joan. It was already abundantly clear that C.T. wanted nothing to do with John.

¶ 58    Moreover, even if the court had authority under the Marriage Act to conduct an *in camera* interview of C.T. under these circumstances, the procedure still needed to afford John due process. John argues that the trial court's failure to allow him to cross-examine C.T. violated his due process rights. He argues that the court's *in camera* interview of C.T. "resulted in vague, conclusory allegations by C.T. which did meet any evidentiary requirements of time and who was present" and left him "unable to challenge vital issues such as the delayed outcry, lack of corroboration, inconsistencies with C.T.'s forensic interview, [and] inconsistencies with other witness[es]." The dissent contends that John waived this issue, stating, "it does not appear that this precise constitutional theory was raised by John in the trial court; thus, it is waived." *Infra*

¶ 73. However, John objected to Joan's motion for C.T.'s testimony to be presented in chambers on due process grounds, arguing that it was "a matter of fundamental fairness and due process that this important witness be subject to cross examination." After the court granted Joan's motion over his objection, John filed a motion to reconsider, arguing that "it would violate [his] right to due process of law to allow a witness to testify in camera without giving a deposition or being subject to cross examination." John's repeated objections to the *in camera* examination of C.T. on due process grounds sufficed to preserve this argument for appeal. See *Spryka*, 366 Ill. App. 3d at 165; *Nave v. Rainbo Tire Service, Inc.*, 123 Ill. App. 3d 585, 589-90 (1984) ("To save a question for review, an objection need not be repeated each time similar matters are presented where the court has previously ruled.").

¶ 59    We review *de novo* whether a party was denied due process. *People v. Sauls*, 2022 IL 127732, ¶ 32. The dissent contends that John's due process argument "appears to implicate a sixth amendment right to cross-examine witnesses," which "appl[ies] [only] to criminal prosecutions." *Infra* ¶ 75. However, John never referenced his sixth amendment right to confront C.T. Instead, he argued that the *in camera* examination of C.T. and his inability to cross-examine her would violate due process, which "requires a party to be given the opportunity to be heard at a meaningful time and in a meaningful manner." *In re H.B.*, 2022 IL App (2d) 210404, ¶ 50. Due process is a flexible concept, which " 'calls for such procedural protections as the particular situation demands.' " *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). However, "[i]n almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Goldberg v. Kelly*, 397 U.S. 254, 269 (1970); *In re Marriage of Bates*, 212 Ill. 2d 489, 513 (2004) (the opportunity to cross-examine witnesses and to inspect the evidence offered against a party are part

of guaranteeing the exercise of due process). To determine whether a procedure comports with due process, a court must consider and balance (1) the private interests affected, (2) the risk of an erroneous deprivation of that interest through the procedures used and the probative value of any additional or substitute safeguards, and (3) the governmental interest. *Mathews*, 424 U.S. at 335.

¶ 60    C.T.'s allegations of sexual abuse directly implicate John's right to parent his children. A parent has a fundamental interest in the care, custody, and control of his children. *In re Andrea F.*, 208 Ill. 2d 148, 165 (2003). This is "perhaps the oldest of the fundamental liberty interests" recognized by the United States Supreme Court (*Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion)) and is "among the most basic civil rights." (Internal quotation marks omitted.) *In re H.B.*, 2022 IL App (2d) 210404, ¶ 51. This is an "important interest, warranting deference and protection, absent a powerful countervailing interest." *In re Marriage of Bates*, 212 Ill. 2d at 512. Nevertheless, this right is not without limits and must be balanced against the government's interest in "preserving and promoting the welfare of the child." *Santosky v. Kramer*, 455 U.S. 745, 766 (1982). At the same time, we recognize that Joan's right as a parent to protect C.T. from reliving any trauma is also a substantial interest that merits respect and protection.

¶ 61    The court must also consider the risk of an erroneous deprivation of a party's interest given the procedures used. *Colquitt v. Rich Township High School District No. 227*, 298 Ill. App. 3d 856, 861 (1998). In this case, the court's refusal to allow John's attorneys to cross-examine C.T. due to its concerns that doing so would retraumatize her imposes too high a risk that John will be erroneously deprived of his parental rights. "Cross-examination is the primary method by which a witness's believability and credibility may be challenged." *People v. Myles*, 2020 IL App (1st) 171964, ¶ 20. Basic notions of fair play require that the parties have the opportunity to cross-examine or refute facts which form the basis of the court's decision. *Six-Brothers King Drive*

*Supermarket, Inc., v. Department of Revenue*, 192 Ill. App. 3d 976, 983-84 (1989); see *In re Marriage of Bates*, 212 Ill. 2d at 513 (holding that petitioner's due process rights were violated when she was unable to cross-examine a witness, stating that "the opportunity to cross-examine witnesses and to inspect the evidence offered against a party are part of guaranteeing the exercise of due process" and finding that "[w]ithout the important tool of cross-examination, [petitioner's] means of challenging [the child representative's] observations, conclusions, and recommendations were impaired").

¶ 62    We find that the court's decision to bar any cross-examination of C.T. here and its failure to employ the reasonable alternatives offered by John's attorney violated John's procedural due process rights. John was limited to submitting 20 questions for the court to ask C.T. during her *in camera* interview about allegations that he sexually abused C.T. over a number of years in many different locations. This procedure is hardly an adequate substitute for cross-examination by an attorney, particularly where John was precluded from deposing C.T. and she was the only witness with firsthand knowledge of any sexual abuse.

¶ 63    While the trial court's concern about protecting C.T. from reliving any trauma is understandable, it could have employed other procedures suggested by John's counsel that would have protected C.T., such as allowing her to testify remotely over the Zoom platform so that she would not have to be in the same room with John or permitting her to testify at her GAL's office, with her GAL at her side for moral support. Moreover, the attorney representing Joan and the GAL for C.T. were present to protect C.T.'s interests and object to any irrelevant or abusive line of cross-examination. Moreover, the trial court could have controlled the cross-examination by John's attorney without foreclosing it entirely. These safeguards would have protected Joan's and C.T.'s interests without depriving John of his due process rights.

¶ 64    Joan argues that even if the trial court erred by failing to allow John to cross-examine C.T., the error was harmless because the court allowed John's attorney to submit questions he wanted asked during the *in camera* interview, permitted the attorneys to be present during the interview, and checked in with them after questioning C.T. to ensure that their questions had been asked. However, John's attorneys were limited to 20 questions in total, and the court expressly informed them that if it "f[ou]nd [a] question to be more of a cross examination question [it was] not going to ask the question that way." Moreover, at the conclusion of the court's examination of C.T., John's attorney indicated that several questions from her list had not yet been asked. While the court did ask several follow-up questions before concluding its interview with C.T., these questions are not part of the record, so it is unclear if John's attorney's questions were asked. What is more, John's attorney was given no opportunity to respond to or challenge C.T.'s testimony during the *in camera* hearing or to ask additional questions beyond the 20-question limit the court had imposed prior to the examination. "The cross-examination of a witness is necessarily exploratory and the attorney often cannot know in advance what facts may be elicited on cross-examination." *People v. Kellas*, 72 Ill. App. 3d 445, 454 (1979); *People v. Soto*, 64 Ill. App. 2d 94, 102 (1965) ("Counsel often cannot know in advance what pertinent facts may be elicited on cross-examination.). These limitations "created a substantial danger of prejudice by denying [John] his right to test the truth of [C.T.'s] testimony." *People v. Averhart*, 311 Ill. App. 3d 492, 497 (1999); *cf. Alford v. United States*, 282 U.S. 687, 692 (1931) ("Prejudice ensues from a denial of the opportunity to place the witness in his proper setting and put the weight of his testimony and his credibility to a test, without which the jury cannot fairly appraise them."). The dissent disagrees and finds that the *in camera* procedure employed by the court was sufficient, particularly because the parties' attorneys were present during the examination and they were permitted to submit

questions to the court. For support, the dissent relies on *In re Rider*, 113 Ill. App. 3d 1000 (1983) and *In re Brooks*, 63 Ill. App. 3d 328 (1978), but neither case supports its position. In *Rider*, the court found that the trial court's reliance on information it obtained from a child during the course of an *in camera* examination to determine that the father should be placed under a supervisory order of protection was improper, reasoning that "fundamental fairness requires that such an order not be entered before the person to be subjected to the order has a reasonable opportunity to present evidence and be heard on the matter." *Rider*, 113 Ill. App. 3d at 1003-04. And *Brooks* is critically distinguishable from this case because there the court "took steps to protect respondents' [due process] rights," including "subject[ing] [the child] to cross-examination." *Brooks*, 63 Ill. App. 3d at 340. The court's refusal to allow C.T. to be cross-examined here is the precise basis for John's due process challenge.

¶ 65    Joan alternatively argues that any error was harmless because John's attorney was permitted to cross-examine the rest of Joan's witnesses, including C.T.'s brother, mother, grandfather, the investigating detectives, and GALs Traub and Barclay, and highlight any inconsistencies and the lack of corroboration of C.T.'s claims. But an error cannot be harmless if it "affected the outcome of the trial." (Internal quotation marks omitted.) *Hoffman v. Northeast Illinois Regional Commuter R.R. Corp.*, 2017 IL App (1st) 170537, ¶ 42. Here, C.T. was the only witness with first-hand knowledge about the sexual abuse, and this case hinged on her credibility. Therefore, the court's decision to conduct an *in camera* interview of C.T.—and John's ensuing inability to challenge her credibility through cross-examination—cannot be deemed harmless. Without C.T.'s testimony, Joan had no case. There were no other witnesses to the alleged abuse, and there was no physical evidence to corroborate C.T.'s claims. *Cf. Kimble v. Illinois State Board of Education*, 2014 IL App (1st) 123436, ¶ 82 (finding plaintiff's due process rights were violated

where it was undisputed that the outcome of her employment termination hearing was "directly dependent" on the credibility of statements given by a single witness, plaintiff denied the conduct, there were no eyewitnesses to the alleged incidents, and plaintiff "did not have the opportunity to cross-examine [the sole] witness whose testimony was indispensable to the outcome of a hearing in which her constitutionally protected interest in continued employment was at stake"); see also *In re Leslie C.*, 224 A.D. 2d 947, 947 (N.Y. App. Div. 1996) (finding that the court erred when it precluded stepfather's attorney from cross-examining a nine-year-old child during an *in camera* interview in an abuse case, reasoning that cross-examination was necessary because the petitioner had to prove that the child was abused and that the stepfather was responsible for the abuse, the child was "in adversarial position" to her stepfather, and the child's testimony was "essential to establishing petitioner's case").

¶ 66    We also find that the trial court's *in camera* interview of C.T. violated John's due process rights in another important aspect. By its very nature, an *in camera* interview is far less formal than an evidentiary hearing in a courtroom. It is intended to allow a child space to express his or her preference regarding allocation of parental responsibility outside the presence of the child's parents. Here, however, the trial court's comments both during and immediately after C.T's testimony indicated that it believed C.T. and that it had already concluded that John abused C.T. The court told C.T., for example, that she was doing "remarkably well for what has happened in [her] family," that it was "going to make sure [she got] some therapy that's more than on-line where [she could] spend time discussing 4th grade until right now[,]" and that it would make sure C.T. got into therapy so she could "put this moment behind [her]." These statements suggest that the trial court had already decided that John sexually abused C.T. even before hearing John's testimony, which is the "antithesis of a fair trial." *People v. White*, 249 Ill. App. 3d 57, 60 (1993)

27

("A fair and impartial trial is a judicial process by which a court hears before it decides; by which it conducts a dispassionate inquiry and renders judgment only after receiving evidence.").

¶ 67    Because this case rested almost entirely on C.T.'s testimony, the trial court's decision to conduct an *in camera* interview and bar John's attorney from cross-examining C.T. cannot be deemed harmless.

¶ 68                                    III. CONCLUSION

¶ 69    For the reasons above, the judgment of the circuit court is affirmed in part and reversed in part and the case is remanded for a new evidentiary hearing.

¶ 70    Affirmed in part and reversed in part; cause remanded.

¶ 71    JUSTICE ODEN JOHNSON, concurring in part and dissenting in part:

¶ 72    I agree with the majority's conclusions for the first three issues raised in this appeal. However, I do not agree with the conclusion reached for the final issue, namely whether the trial court's *in camera* questioning of the daughter violated John's due process rights as he could not depose or cross-examine her. I respectfully dissent from the majority's position for the following reasons.

¶ 73    First, it does not appear that this precise constitutional theory was raised by John in the trial court; thus, it is waived. See *Haudrich v. Howmedica, Inc.*, 169 Ill. 2d 525, 536 (1996). The theory upon which a case is tried in the lower court cannot be changed on review, and an issue not presented to or considered by the trial court cannot be raised for the first time on review. *Id.* John does not indicate that this theory was presented below nor does the factual background state that this constitutional issue was raised in the trial court. A party's failure to first raise an issue or theory in the trial court weakens the adversarial process and our system of appellate jurisdiction and prejudices the opposing party by depriving that party of the opportunity to respond to the issue or

theory with its own evidence and judgment. *People ex rel. Department of Transportation v. Greatbanc Trust Co.*, 2018 IL App (1st) 171315, ¶ 13. As waiver applies equally in cases involving constitutional rights and constitutional claims on appeal (*id.* ¶ 25), I would not consider this issue on appeal.

¶ 74 Waiver aside, I do not agree that the trial court's *in camera* interview of the daughter violated John's constitutional due process rights.

¶ 75 In his brief, John argues that the opportunity to cross-examine witnesses and to inspect the evidence offered against a party are part of the due process guarantee and further that a parent has a private interest and fundamental due process right to the companionship, care, custody, and management of their children. John's argument appears to implicate a sixth amendment right to cross-examine witnesses. However, proceedings under the Illinois Domestic Violence Act of 1986 (Domestic Violence Act) (750 ILCS 60/101 *et seq.* (West 2022)) are civil in nature and do not implicate sixth amendment rights, as those rights apply to criminal prosecutions. See *In re Es. C.*, 2021 IL App (1st) 210197, ¶ 17. Nevertheless, this court has applied the sixth amendment confrontation clause to civil cases involving procedures before administrative agencies, only where there was gross deviation from fair procedure. *Id.* I disagree with the draft's application of criminal cases to analyze John's claim regarding the lack of cross-examination.

¶ 76 The case cited by John to support this theory of due process is *In re Marriage of Bates*, 212 Ill. 2d 489 (2004), which was a custody case and thus distinguishable from the case at bar. In that case, our supreme court held that the statutory provision (section 506(a)(3) of the Illinois Marriage and Dissolution of Marriage Act (Marriage Act) (750 ILCS 5/506(a)(3) (West 2004)) providing for the admission of child's representative's recommendation without testifying, as applied to the mother, deprived her of due process and was unconstitutional. *In re Marriage of Bates*, 212 Ill. 2d

at 508-515. The specific question before our supreme court in that case was whether the statutory prohibition against calling the child's representative as a witness created a risk of erroneous deprivation of the mother's custodial rights. *Id.* at 513.

¶ 77 That is not what happened here as there was no statutory provision invoked to infringe on a parent's custodial rights. Instead, in this case, there was a hearing before the trial court on the mother's petition for a plenary protective order on behalf of the parties' child as a result of alleged sexual abuse of the child, which necessarily affected John's visitation and/or custodial rights. Restriction or denial of a respondent's visitation rights is a remedy under the Domestic Violence Act. 750 ILCS 60/214(b)(7) (West 2022). Thus the essence of the court's ruling necessarily implicated questions of custody and visitation. This court has previously concluded that the Marriage Act would apply under the circumstances. See *Wilson v. Jackson*, 312 Ill. App. 3d 1156, 1163 (2000); *In re Marriage of Gilbert*, 355 Ill. App. 3d 104, 112 (2004).

¶ 78 As part of the hearing in this case, on the mother's request for an *in camera* examination of the daughter, the trial court examined the daughter without either party present but in the presence of their respective attorneys and asked questions submitted by each party's attorney. Such *in camera* examination has been found permissible in a dispositional proceeding. *In re Rider*, 113 Ill. App. 3d 1000, 1003 (1983); *In re Brooks*, 63 Ill. App. 3d 328, 340 (1978).

¶ 79 In *Brooks*, the minor child was permitted to testify in the court's chambers outside the presence of his parents but with counsel for all parties present. *Brooks*, 63 Ill. App. 3d at 340. This court noted that the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2022)) entitled respondents to certain rights including the right to be present and to cross-examine witnesses, and further that in child custody cases, the trial court in its discretion may interview a child alone in chambers and then make the substance of the interview a part of the record. *Id.* The rationale for

allowing such interviews is that the best interests and welfare of the child are determinative in custody cases, and special care must be exercised by the court on behalf of the minor child. *Id.* The same rationale has been applied in cases involving visitation rights. *Id.* (citing *Regan v. Regan*, 53 Ill. App. 3d 50 (1977)). Even the Code of Criminal Procedure of 1963 allows minor victims of sexual assault to testify via closed-circuit television. 725 ILCS 5/106B-5 (West 2022). Under that section, a child can testify outside of the courtroom via closed-circuit television if the testimony is taken during the proceeding and the judge determines that testimony by the child victim in the courtroom will result in the child suffering serious emotional distress. *Id.*

¶ 80     As noted, in this case the guardian *ad litem* for the daughter and both parties' attorneys were present for the *in camera* testimony. Although the daughter had turned 18 years old during the proceedings, she was still in high school and was not living independently, and a *guardian ad litem* continued to represent what was in her best interest. During the *in camera* testimony, each parties' attorney was allowed to submit questions to the trial court for the daughter. Moreover, when John's attorney specifically requested that his questions 11 through 13 be asked of the child, the trial court obliged. Accordingly, I would find that it was proper for the trial court to consider the welfare of the daughter and her emotional distress in determining whether her testimony should be *in camera* and permissible for the court to do so. Because John's attorney was present and allowed to submit questions, it cannot be concluded that gross deviation from fair procedure applied.

---

*In re Marriage of Doe*, 2024 IL App (1st) 230935

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 2019-D-53086; the Hon. Renee Jackson, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Juliet E. Boyd, of Boyd & Kummer, LLC, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Benna S. Crawford and Leah Yaris, of Legal Aid Chicago, of Chicago, for appellee. |