2024 IL App (1st) 231374-U

No. 1-23-1374

Order filed October 11, 2024

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| SABRINA LYNNISE HALL, | ) | Appeal from the |
| | ) | Circuit Court of |
| Hall-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 22 OP 78077 |
| | ) | |
| JAMES EARL NASH JR., | ) | Honorable |
| | ) | Thomas M. Cushing |
| Nash-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE TAILOR delivered the judgment of the court.
Justices Hyman and Gamrath concurred in the judgment.

**ORDER**

¶ 1    *Held*: Circuit court's judgment affirmed where the entry of a two-year plenary order of protection was not against the manifest weight of the evidence.

¶ 2    James Earl Nash Jr. appeals from the circuit court's entry of a two-year plenary order of protection against him and in favor of Sabrina Lynnise Hall. On appeal, Nash argues that (1) the order should be vacated because the finding was against the manifest weight of the evidence, and (2) the circuit court erred in denying his motion for a new trial. We affirm.

¶ 3    On October 5, 2022, Hall filed her *pro se* petition for emergency order of protection against Nash, whom she identified as her boyfriend or an individual with whom she had a dating relationship. Both Hall and Nash were police officers at all relevant times. Hall alleged that on September 1 or 2, 2022, Nash followed her vehicle, driving aggressively, pulled alongside her, and signaled for her to lower the window.[1] Hall then called a police sergeant and drove to a police station, and Nash followed her without her invitation. Hall also alleged that on September 28 or 29, 2022, Nash "took" her Apple watch, "broke into the device," and contacted individuals regarding information he found therein. According to Hall, Nash admitted to stealing the watch and photographing the information.

¶ 4    On the same day, the circuit court denied the petition for an emergency order of protection, finding that Hall had not presented sufficient evidence. The court continued the matter.

¶ 5    On November 9, 2022, Hall filed her *pro se* emergency motion to reconsider the denial of the petition for an emergency order of protection and to amend the petition. Hall attached her affidavit alleging that she and Nash dated "on and off" starting in August 2019 and lived together "on and off" from approximately December 2020 to June 2022.

¶ 6    Hall also averred in her affidavit that on or about September 27, 2022, at approximately 11:30 p.m., Hall went to Nash's residence and fell asleep in the bedroom. Nash woke her with his genitalia on the left side of her face, aggressively stating, "open your mouth" and "I know you're not asleep that quick." Hall attempted to turn her head. Nash undressed her and attempted to penetrate her using his genitalia and fingers. Hall asked Nash to stop, but he flipped her over, attempted to penetrate her again, and placed his fingers in her mouth. She repeatedly asked him to

---

[1] In subsequent pleadings and testimony, the date of this incident is identified as October 1, 2022.

stop, and he continued the behavior for approximately 30 minutes. Hall stated that Nash had been emotionally and sexually abusive, and she feared further abuse.

¶ 7    Hall further averred that on or about September 30, 2022, at approximately 10:30 a.m., she went to a gym where she conversed with Nash's neighbor. The neighbor told her to "check" for her Apple watch because Nash had asked the neighbor if he and Hall were sleeping together. When Hall "pinged" her watch, it was located at Nash's residence. Hall later learned that Nash contacted other individuals from her contact list. Then, on or about October 1, 2022, at approximately 1:30 a.m., Nash drove alongside her for approximately eight miles and asked her to lower her window. Hall did not want to speak with him, and the incident made her "fearful."

¶ 8    On November 10, 2022, the court granted Hall's motion to reconsider and to amend the petition. The court entered an emergency order of protection prohibiting Nash from harassing, physically abusing, and stalking Hall, and from interfering with her personal liberty. It further prohibited Nash from contacting Hall and ordered that he stay away from her.

¶ 9    On November 17, 2022, Nash moved to vacate the emergency order of protection, but later withdrew the motion. On January 13, 2023, the court proceeded to a hearing for a plenary order of protection.

¶ 10    Hall testified that she and Nash dated for four years. On March 14, 2021, Nash left Hall a voicemail that made her feel like "less than a person, [and] afraid." An audio recording of the voicemail was published for the court.[2]

¶ 11    On September 27, 2022, Hall asked to come to Nash's residence, and Nash agreed. There, she entered his bedroom and fell asleep "facedown." As she slept, Nash pushed his genitalia across

---

[2] The audio recording is not included in the record on appeal.

her face, towards her mouth, stating, "open your mouth, open your mouth, you are not asleep that quick." Hall said no and tried to turn her head. Nash then got behind her, "rode" her dress up, and attempted to anally penetrate her by force but she resisted him. When he was unsuccessful, Nash "turned" her over without speaking, vaginally penetrated her, and placed his fingers in her mouth. Hall told Nash that she did not want to do that. After Nash ejaculated, he turned the lights off and they went to sleep. She left the next morning

¶ 12     She did not know what to feel but was "afraid" to say anything because she did not know how "it" would be perceived, and she was embarrassed. She testified that if she did not go along with Nash that it may "have triggered something", that she did not know "what he would be capable of", and that she did not "want to take the chance." Hall stated that there were previous incidents during her relationship with Nash that caused her to be afraid. Hall described an incident in December 2021, while she was pregnant, where Nash grabbed her by her jacket, pinned her against a wall, and then pinned her to the ground, bruising her chin. There were other incidents during their relationship where Nash threatened her.

¶ 13     Hall returned to Nash's residence later that day, on September 28, 2022, between 7 p.m. and 8 p.m., with her police partner to see Nash's puppies. Hall stayed for about 20 minutes. She returned to Nash's house again that day at approximately 11 p.m. Hall was wearing her Apple watch when she arrived. She spent the night at Nash's residence.

¶ 14     On September 30, 2022, she went to the gym and conversed with Nash's neighbor. Afterwards, she "ping[ed]" her Apple watch, and learned it was located at Nash's residence. Hall testified that she did not leave the Apple watch there and the last time she saw the watch, it was on her wrist. Hall attempted to erase the contents of the Apple watch. Hall learned that Nash had

contacted individuals, including Anthony Davis, through information he found in her Apple watch.

¶ 15    On October 1, 2022, at approximately 1:30 a.m., Hall left work. She had already texted Nash and asked him if he had her Apple watch and questioned how he was going to return it to her. Before leaving the station, she made a report with her sergeant alleging that her Apple watch had been stolen. At approximately 1:46 a.m., near 55th Street and Ellis Avenue in Chicago, Hall noticed a black truck approach her vehicle from behind. The truck cut in front of her, and when she saw the license plate, she "was able to identify that it was James Nash." Near 55th Street and Wentworth Avenue, she and Nash had a conversation where she told Nash that she needed to return to the police station to retrieve her vest. Hall called her sergeant, who instructed her to return to the station. She entered the parking lot and then the station. Nash remained in the parking lot with a sergeant. Hall had not informed Nash about her location when she encountered him on the street, and when he followed her, she felt nervous because she did not know his intentions. She returned to the station because she was afraid and felt she would be safer there.

¶ 16    Hall testified that she reported the events that occurred on September 27, 2022, to internal affairs. She also spoke with detectives and there was an ongoing investigation into her allegations of criminal sexual assault.

¶ 17    On cross-examination, Hall confirmed that she and Nash were both police officers and dated for four years. Her initial petition for an emergency order of protection did not allege that Nash physically abused or sexually assaulted her. Hall testified that in the early morning hours of October 1, 2022, she had left her police job and was headed to her side job. Previously, Nash had met her for "lunch and stuff like that" at her side jobs. She did not initially include the sexual assault in her first petition because she did not "have the support" and "did not feel comfortable

speaking at that point, which is why [she] sought out a court advocate." Hall confirmed that she did not aver in her affidavit attached to her amended petition that Nash attempted to penetrate her anally. Hall told her mother about the sexual assault on the morning of September 28th after she left Nash's house.

¶ 18    Defense counsel published several videos from the exterior and interior of Nash's residence. In five of the videos Hall identified herself, her police partner, or Nash entering or exiting Nash's residence on September 28, 2022, the day after the alleged sexual assault. One video from the interior depicted Hall retrieving a box from the bathroom to give Nash a foot massage.

¶ 19    Defense counsel also published a screenshot of text messages between Hall and Nash from September 28, 2022. In the text messages, Hall told Nash that she made it home, and later that day, she texted him, "I love you." Nash responded "I see you playing a game of battle, we the better, huh? LOL. SMH." Hall denied that Nash's text was referring to a competition between Hall and her police partner that Hall had a better relationship with her boyfriend than her police partner had with her boyfriend.

¶ 20    Hall further testified that she sent Nash's March 14, 2021, voicemail to some of Nash's family members, and Nash was upset that "other individuals found out how he [spoke] to [her]." According to Hall, the voicemail was not about money that she owed him; rather, Nash wanted her to pay a portion of his mortgage because she spent "extensive" time at his residence and also wanted her to return items he bought her. Hall discovered her Apple watch was missing on September 30, 2022, when Nash's neighbor informed her. She was at Nash's residence on the night of September 28, 2022, and did not notice that she left her watch. While at Nash's residence,

he charged her devices.

¶ 21   On redirect examination, Hall reiterated that she did not mention the sexual assault in the initial petition because she was "in fear" and did not have support. She feared what Nash would say and what would potentially happen if he learned that she made the allegation. After the initial court hearing, Hall spoke with the "Employee Assistant [*sic*] Program," went to therapy, and spoke with a court advocate who explained the process and helped her draft the motion to reconsider. Hall confirmed that her affidavit stated that Nash put his genitalia on the left side of her face. However, she did not personally write that; rather, Nash put his genitalia on the right side of her face as she testified. She did not return to Nash's residence after September 28, 2022. She had not communicated with Nash since September 29, 2022, beyond asking for her Apple watch.

¶ 22   On re-cross examination, Hall confirmed that she signed the affidavit attached to the emergency motion to reconsider under penalty of perjury.

¶ 23   Anthony Davis testified that on September 30, 2022, he received a "very strange" phone call around 7 p.m. or 8 p.m. from a private number. The caller identified himself as Nash. Nash stated that he was Hall's ex-boyfriend, had searched her Apple watch, found her texts with Davis, and decided to call him to learn who he was. Nash added that he had photographed information in Hall's watch.

¶ 24   On cross-examination, Davis testified that he and Hall communicated via text messages and "maybe" a phone call. He was "a little sexually forward" in the conversations, but Hall was not.

¶ 25   Nash moved for a directed finding, which the circuit court denied, noting that Hall had testified that she was sexually assaulted.

¶ 26    Nash testified that he and Hall dated for about four years. His relationship with Hall ended in late September or early October 2022. Nash described their relationship as "fun," "kind of up and down," and "toxic at times." Regarding the voicemail, Nash explained that Hall "[took] things" that she gave him and had not repaid him for an airline flight he purchased. In fall 2022, Hall started making "harassing phone calls and messages, blocking his driveway, breaking things, harassing other people, lying on him," and "accusing [him] of *** so much wrong doing that didn't exist." Nash believed that Hall was being unfaithful.

¶ 27    On the day of the alleged sexual assault, Nash charged Hall's devices. They exited his residence together and he walked her to the end of the driveway, where he gave her a hug and a kiss. When he reentered, he noticed Hall's "iWatch" on the charger. He looked through the watch and found that she was conversing with other men. He contacted those men, including Davis and a neighbor, because he was planning to ask Hall to marry him that year. Nash attempted to confront Hall about the other men she was talking to, but she refused to give him her exact location. He stopped communicating with her because he was frustrated and "didn't know exactly what to do." He told her that they could speak "wherever she [felt] safe," but she needed to retrieve her belongings, including her watch, so they could "completely remove" one another from each other's lives.

¶ 28    On October 1, 2022, Nash wanted to see Hall and have "a closure of a conversation," so he attempted to drive to her "side job." When he encountered Hall as she was driving near 55th Street, he pulled beside her vehicle, asked her to lower the window, and requested to talk. Hall said, "Okay. Let me go the station to get my vest." He thought "something [was] not right," and told Hall that he would park so they could speak. Hall told him to follow her to the station. He

asked if she was sure she was willing to speak and she replied yes. He followed her to the police station and entered the lot after her. She then walked past him, and he was approached by two sergeants. He was not aware that she contacted the police station and said she was being followed. He had not communicated with Hall since that date.

¶ 29    Defense counsel published the same video footage of the exterior and interior of Nash's residence that had been played during Hall's testimony. Nash testified consistently with Hall regarding what the footage depicted.

¶ 30    Nash testified that Hall did not complain that he was too rough with her. On September 27, 2022, Hall came to his residence after she called and asked him if she could spend the night. He left the back door open for her and when she came in, he was already in bed. Hall laid in the bed with him. She "came close up on [him]" and "put herself on [him]," waking him. He began to kiss her, and they had consensual sex. There were no words exchanged like, "no or stop or this isn't okay or anything in the negative form at all." He denied that Hall woke up with his genitalia on her face and denied telling her to open her mouth and that he knew she was not asleep that fast. He also denied undressing her, attempting to penetrate her anally or orally, and putting his fingers in her mouth. Hall did not complain to him that she thought he sexually assaulted her. He described the sexual encounter with Hall as "a sexual encounter as many other times we have done it." Nash stated that he wanted Hall to leave him alone, that he did not want any more abuse or "any toxic anything."

¶ 31    On cross-examination, Nash confirmed that he told Hall in the audio recording that she was "gonna get the 63rd Street n*** [she had] been begging for." He stated that the audio recording that Hall said was a voicemail was a phone call that was recorded without his permission. He

admitted that on October 1, 2022, Hall did not invite him to meet with her. He denied following her to her side job and testified that he was on his way to see her at her side job when he "noticed it was her vehicle, and that is when I pulled beside the vehicle.' Nash thought Hall was already at work.

¶ 32    The court granted Hall a two-year plenary order of protection, prohibiting Nash from physically abusing and harassing her. The court also ordered Nash to stay away from Hall and not communicate with her. Nash was further prohibited from taking any property from the interior or exterior of Hall's residence.

¶ 33    The court noted that it weighed the demeanor and credibility of the witnesses and found that Hall was "quite credible" and that her demeanor was "consistent" with that of a "rape victim." The court acknowledged that Hall's initial petition did not allege rape, but found Hall's explanation that she did not have the support or the strength to tell the story of the rape was "reasonable and credible." The court recognized the inconsistencies that Nash emphasized, such as Hall returning to his home twice the next day, spending the night, and giving him a foot bath, but those facts did not overcome the court's conclusions. Hall's behavior was not "inconsistent with what [the court knew] to be the broad range of responses that people have to sexual assault."

¶ 34    The court found that when Hall encountered Nash on the street, her conduct in returning to the police station and contacting sergeants was consistent with someone who was "fearful *** in a way that [was] more grave than being aware that he found out she was talking to" other men. The audio recording provided context for Hall's testimony that she was fearful of Nash if she disclosed the sexual assault and provided insight into the aggressive way Nash reacted to Hall.

¶ 35    The court acknowledged that Nash's testimony was an "180-degree contrast" from Hall's,

but found his rationale that Hall fabricated the allegations because she was caught talking to another man was not compelling. Furthermore, the court was "not persuaded that there was a motivation to lie on the Hall's part." The court found that Nash violated the Domestic Violence Act (Act) by going through Hall's "phone" and contacting individuals on her phone, and that the sexual encounter on September 27, 2022, was "more likely than not" nonconsensual.

¶ 36 On February 9, 2023, pursuant to section 2-1203(a) of the Code of Civil Procedure (Code) (735 ILCS 5/2-1203(a) (West 2022)), Nash filed a motion for a new trial based upon newly discovered evidence and/or to reconsider and vacate the order of protection entered on January 13, 2023. Nash's newly discovered evidence consisted of video footage of the sexual encounter on September 28, 2022. Nash argued that the video contradicted Hall's testimony regarding the sexual encounter, was newly discovered and material, and would have affected the outcome of the case. Nash further asserted that he exercised due diligence in searching for the video, but due to the number of digital files he had, he was unaware that the video existed. Nash alternatively argued that the order of protection should be reconsidered and vacated because Hall was not credible. Nash attached his affidavit in which he averred that he and Hall took photographs and videos of their sexual encounters. Due to the "private nature" of the videos, they were "labelled and hidden" in his iCloud electronic storage account "under 'hidden file.' " During discovery, he conducted a "diligent search" of his "video and photo library" to support his defense but could not locate any videos. The day after the court issued its ruling, he searched the files again and discovered additional videos in the "file labelled hidden file," including video of the September 28, 2022, sexual encounter. Nash asserted that he was unaware that he and Hall recorded the sexual encounter, and the video had not been "doctored, edited or in anyway [sic] altered."

¶ 37    In response, Hall argued that Nash failed to show that the evidence was conclusive, was discovered since the trial, and could not have been discovered before trial by reasonable inquiry or due diligence.

¶ 38    On May 30, 2023, the court heard oral arguments on the motion and reserved its ruling for a written decision. On July 5, 2023, the court issued an 11-page written decision denying Nash's motion.

¶ 39    Regarding Nash's contention that the video constituted newly discovered evidence, the court found that Nash had not met his burden. Nash's claim that he could not have found the video through due diligence, even though he created and stored the video, was a "compelling blow" to his credibility. Also, Nash failed to demonstrate that the video could not have been produced prior to trial. The court additionally found that the video did not "clearly demonstrate someone engaged in consensual sex," and, therefore, was not so conclusive that it would have probably changed the result of the hearing.

¶ 40    Regarding Nash's alternative argument that the order of protection should be vacated because Hall was incredible, the court stated that it found Hall "very credible" and that she had met her burden of proof. The court emphasized that "Hall's demeanor, sobbing and shaking" during her testimony, was consistent with her testimony that she was a "victim of non-consensual intercourse." Hall's testimony that she was "fearful" of Nash and "chose to act as if nothing was the matter in the immediate aftermath of the attack was plausible and believable." Hall testified that she needed assistance from a therapist and domestic violence advocate to proceed with the rape allegations.

¶ 41    The court stated the audio recording of Nash was "intensely harassing and violently threatening" and that his "claimed explanation *** damaged [his] credibility." Hall presented unrebutted testimony that in December 2021, Nash pinned her on the wall and ground and bruised her chin while she was pregnant. The court noted that the parties contradicted each other regarding "central facts." Having considered Nash's affidavit in support of his motion, the court was "more resolute" in its conclusion that Hall met her burden and was "clearly the more credible" party.

¶ 42    Nash appealed. After Hall failed to file an appellee's brief, on June 17, 2024, this court entered an order taking this case for consideration on the record and Nash's brief only. See *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133 (1976) (reviewing court may decide a case on appellant's brief alone "if the record is simple and the claimed errors are such that the court can easily decide them without the aid of an appellee's brief").

¶ 43    On appeal, Nash first contends the circuit court's entry of the plenary order of protection should be vacated because its factual findings were against the manifest weight of the evidence. "Proceedings to obtain an order of protection are civil in nature and governed by a preponderance of the evidence standard." *Tamraz v. Tamraz*, 2016 IL App (1st) 151854, ¶ 19. The circuit court shall issue a plenary order of protection if it finds the petitioner has been abused by a family or household member. 750 ILCS 60/214(a) 219 (West 2022). A reviewing court will only disturb that finding if it is against the manifest weight of the evidence, which occurs when the opposite conclusion is clearly evident or if the finding is unreasonable, arbitrary, or not based on the evidence presented. *In re Marriage of Doe*, 2024 IL App (1st) 230935, ¶ 34. Under this standard, the circuit court, as finder of fact, is given deference because "it is in the best position to observe the conduct and demeanor of the parties and witnesses." *Best v. Best*, 223 Ill. 2d 342, 350 (2006).

Thus, we will not substitute our judgment for that of the circuit court "regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn" therefrom. *Id.* at 350-51.

¶ 44    We note that the court stated two grounds for granting the plenary order of protection in this case: 1) Nash violated the Act by "going through [Hall's] phone and calling other people," which amount to harassment; and 2) Nash engaged in nonconsensual sex with Hall on the night of September 27, 2022. Nash only challenges the court's finding with respect to him engaging in nonconsensual sex with Hall. Because he fails to challenge the other ground on which the order of protection was granted, he has forfeited that argument. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (points not argued in the opening brief are forfeited). We may affirm the judgment of the circuit court on any basis warranted by the record. *Reyes v. Walker*, 358 Ill. App. 3d 1122, 1125 (2005). Accordingly, we assume, without deciding, that the first ground–Nash going through Hall's phone and calling the other men that she had been talking to–constitutes a violation of the Act and, on that basis alone, affirm the court's decision to issue the order of protection in this case.

¶ 45    Nevertheless, we find that the court's factual determinations that Nash engaged in nonconsensual sex with Hall were not against the manifest weight of the evidence. The court noted that the evidence was closely balanced but found that considering all the evidence, including the audio recording of Nash's March 14, 2021, voicemail to Hall that is not in the record on appeal, Hall met her burden of proving that Nash violated the Act.

¶ 46    Hall testified that Nash sexually assaulted her on the evening of September 27, 2022, or in the early morning hours of September 28, 2022. Despite the fact that Hall's testimony was uncorroborated, and that her behavior in returning to Nash's home twice the day after the alleged

sexual assault, spending the night with Nash again, and then giving Nash a foot bath, was "troubling," the court nevertheless considered her demeanor while she testified, weighed her credibility, and found her to be "quite credible." The court found that Hall exhibited behavior in the days following the alleged sexual assault which also indicated that she was fearful of Nash, particularly when she called her sergeant and returned to the police station after encountering Nash while driving to her side job on October 1, 2022. The court also said that the audio recording of Nash's March 14, 2021, voicemail to Hall was "intensely harassing and violently threatening," and provided "context" for Hall's testimony that she was fearful of Nash if she disclosed the sexual assault and insight into the aggressive way Nash reacted to Hall "on some occasions." Because the audio recording is not part of the record, we assume the circuit court accurately characterized the audio recording and that it provides context for and supports the circuit court's assessment that Hall was credible. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984) (doubts arising from the incompleteness of the record should be resolved against the appellant and in favor of the judgment). The court also stated that even though Hall did not allege sexual assault in her initial petition, her demeanor was consistent with being the victim of rape. The court further found Hall's explanation for failing to include the alleged sexual assault in her initial petition, that is, she did not have support and the strength to discuss it, to be plausible. The court considered Nash's testimony that the sexual encounter with Hall was consensual, but ultimately rejected his version after considering Hall's motivation and the fact that she reached out to several different agencies about the alleged sexual assault.

¶ 47    Nash argues that Hall's testimony was incredible and uncorroborated, emphasizing that her behavior in the days following the alleged sexual assault suggested that she was not the victim of

a sexual assault and therefore the court's finding on this issue was against the manifest weight of the evidence. Nash's argument is simply a request for this court to reassess Hall's credibility and the weight the circuit court afforded the evidence, which we cannot do. See *Best*, 223 Ill. 2d at 350-351. Accordingly, we find that the circuit's entry of plenary order of protection was not against the manifest weight of the evidence.

¶ 48     Nash next contends that the court erred in denying his motion for a new trial because the video of the sexual encounter on September 28, 2022, was newly discovered evidence, contradicted Hall's version of the events, and was so conclusive that it would produce a different result at trial.

¶ 49     As an initial matter, we note that Nash did not include in the record on appeal a report of proceedings from the May 30, 2023, hearing on the motion for a new trial and/or to reconsider. Nash filed with this court a motion to supplement the record on appeal with a report of proceedings from the hearing, but this court denied the motion because Nash failed to provide the report of proceedings to this court. In such circumstances, where we do not know what arguments were presented at the hearing, we generally must presume that the circuit court had a reasoned basis for its decision and correctly applied the law and affirm on that basis. See *Foutch v. O'Bryant*, 99 Ill. 2d 389, 392 (1984).

¶ 50     Notwithstanding that a report of proceedings was not included in the record on appeal, the record does contain Nash's written motion for a new trial, the video footage Nash submitted in support of his motion, Hall's response, and the circuit court's detailed 11-page order denying the motion. Therefore, we consider Nash's argument pertaining to his motion for a new trial to the extent the record allows.

¶ 51    Section 2-1203(a) of the Code provides that in cases tried without a jury, a party may file a motion for a "retrial" within 30 days. 735 ILCS 5/2-1203(a) (West 2022). The purpose of a section 2-1203 motion is "to bring to the court's attention newly discovered evidence, changes in the law, or errors in the court's previous application of existing law." *General Motors Acceptance Corp. v. Stoval*, 374 Ill. App. 3d 1064, 1078 (2007). " 'Newly discovered' evidence is evidence that was not available prior to the hearing." *Id.* (quoting *North River Insurance Co. v. Grinnell Mutual Reinsurance Co.*, 369 Ill. App. 3d 563, 572).

¶ 52    To set aside a prior order based on newly discovered evidence, the moving party must show (1) "due diligence in discovering the evidence"; (2) that he or she "could not have produced the evidence at the first trial by exercising due diligence"; (3) "the evidence is so conclusive that it would probably change the trial result"; (4) the evidence is material and relates to the issues; and (5) the evidence is not "merely" cumulative or that its sole purpose is impeachment. *In re Marriage of Wolff*, 355 Ill. App. 3d 403, 409-10 (2005). The circuit court has sole discretion to decide whether to grant or deny the motion, and its decision will not be reversed absent an abuse of discretion. *Illinois Service Federal Savings & Loan Ass'n of Chicago v. Manley*, 2015 IL App (1st) 143089, ¶ 29.

¶ 53    Here, we find that the court did not abuse its discretion when it concluded that the video footage was not newly discovered and denied Nash's motion for a new trial. In its order, the court found that, although Nash claimed he conducted a diligent search of his video and photo iCloud library prior to trial, he provided no facts detailing those diligent efforts or explaining why he was unable to find the video, which he took, prior to trial but was able to do so the day after the court entered a plenary order of protection against him. The court emphasized that Nash knew as early

as November 10, 2022, that whether he and Hall had consensual sex on September 27 or 28, 2022, was a "focal issue in the case."

¶ 54    The court stated that, during the hearing on the motion for a new trial, Nash acknowledged that he created and stored the video in his iCloud account in a file labelled "hidden file," which he had designated specifically for the sexually explicit images and videos of him and Hall. The file Nash designated for sexually explicit videos and photographs "logically would [have been] the first place to look for the video." Yet Nash did not locate the file in that folder until the day after trial. Thus, the court found that Nash failed to demonstrate that he exercised due diligence in discovering the video and that he could not have produced the video at trial by exercising due diligence. See *In re Marriage of Wolff*, 355 Ill. App. 3d at 409-10.

¶ 55    "[T]rial courts should not allow litigants to stand mute, lose a motion, and then frantically gather evidentiary material to show that the court erred in its ruling." *Stoval*, 374 Ill. App. 3d at 1078. The circuit court did not abuse its discretion when it denied Nash's motion for a new trial as the video was not newly discovered.

¶ 56    The judgment of the circuit court of Cook County is affirmed.

¶ 57    Affirmed.